SARGENT & CO. v. WELCO FEED MFG.
CO., Inc.

VY LACTOS LABORATORIES, Inc. v. WEL-
CO FEED MFG. CO., Inc.

Nos. 14467, 14468.

United States Court of Appeals
Eighth Circuit.

April 23, 1952.

Rehearing Denied May 8, 1952.

930

Charles F. Meroni, Chicago, Ill. (Rudolph L. Lowell, Des Moines, Iowa, on the brief), for appellants.

Jesse E. Marshall, Sioux City, Iowa (Wilson Cornwall, Spencer, Iowa, on the brief, Shull & Marshall, Sioux City, Iowa, Cornwall & Cornwall, Spencer, Iowa, of counsel), for appellee.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Sargent & Company, an Iowa corporation having its principal place of business at Des

Moines, Iowa, a manufacturer of various kinds of feed for livestock, brought one of these actions against the Welco Feed Mfg. Company, also an Iowa corporation with its principal place of business at Spencer, Iowa, also a manufacturer of livestock feeds, to enjoin the use by the Welco Company of the words "Mineral and Meal" in connection with the sale of hog feed. An accounting and damages for the alleged improper use of the foregoing words were also prayed for. The trial court dismissed the complaint on the merits. From that judgment Sargent & Company appeals. A companion suit was brought by VyLactos Laboratories, Inc., an affiliate of Sargent & Company, also an Iowa corporation with its principal place of business at Des Moines, Iowa, against the Welco Feed Mfg. Company for the same relief, on account of the use by the Welco Company of the word "Drimolas" in connection with the sale by Welco of a livestock and poultry feed. The trial court also denied relief in that action and the VyLactos company appeals. The actions were consolidated in the trial court and are presented together on appeal.

Sargent & Company has been engaged in the manufacture and distribution of livestock feeds of various kinds for a number of years. Its business is extensive and its operations cover fifteen states. Its plant and home office are in the State of Iowa. On September 11, 1939, it registered the trade name "Minral Meat Meal" with the State of Iowa under the provisions of the Iowa Code, Chapter 548, Code of Iowa 1946, I.C.A. § 548.1 et seq. providing for the registration of trade-marks, labels and advertisements, and a certificate of registration was issued to it by the State of Iowa for that trade name. On February 24, 1940, Sargent & Company applied for registration of the name "Minral Meat Meal" in the United States Patent Office under the Trade-Mark Act of March 19, 1920, now 15 U.S.C.A. §§ 1057(e), 1091, 1092, 1094, 1111, 1114, 1117, 1125, 1126. Pursuant to that application, United States trade-mark registration was granted to Sargent & Company on April 1, 1941. Both of these registrations covered a feed for hogs which was made by a secret formula and

consisted of a combination of minerals and proteins prepared in the form of meal. The state authorities of several of the states in which Sargent & Company operated questioned the descriptive characteristic of the word "Meat", and pursuant to a claim of such state authorities that the use of the word "Meat" was misdescriptive, Sargent & Company, on October 11, 1943, filed its application in the Patent Office for registration of the name "Minral Meal", describing the product to which the trade-mark was to be applied as feed for hogs. Pursuant to that application, United States Trade-Mark registration was granted Sargent & Company for the use of the trade-mark "Minral Meal" on June 13, 1944. On October 8, 1943, Sargent & Company obtained a new certificate of registration from the State of Iowa for the name "Minral Meal." Sargent & Company, in its advertisements of this hog feed, had for a number of years prior to the filing of this action on December 20, 1950, been using a picture of a fat hog feeding itself with a spoon from an open bag. This picture was displayed upon its trucks, in its advertising matter, and frequently but not always on the bags in which its product Minral Meal was sold. It expended through the years over $300,000 in advertising its Minral Meal and has built up an extensive and valuable business in the manufacture, sale and distribution of this product. On March 15, 1951, shortly before the trial of this case, Sargent & Company registered a figure of a pig or hog, standing upright, holding a spoon in front of an open bag, with the State of Iowa, under the Iowa Code, supra.

The defendant Welco Feed Mfg. Company was established in 1941 as the Wood Elevator Company by Mr. Charles E. Wood, who owned that company. In 1946 it was incorporated under the name Welco Feed Mfg. Company. It has at all times since 1941 manufactured mineral or mineralized types of livestock feeds. All of its products except Drimolas were distributed under the trade name "Sweet as Honey", which was registered with the State of Iowa on October 8, 1948, under the Iowa Code of 1946, supra. Each of the

defendant's many livestock feed products, other than Drimolas, carried the trade name "Sweet as Honey" prominently displayed on it, and also the particular name of the particular product. The words "Mineral and Meal" were prominently displayed on the bags in which defendant marketed its mineralized hog feed. The bags were somewhat similar in design and color and had thereon a picture of a hog and two pigs with spoons, dancing around an open bag. The defendant's corporate name was also prominent on its advertisements and the products it sold.

Sargent & Company's and VyLactos' causes of action were based upon an alleged infringement of their registered trademarks "Minral Meal" and "Omalass", and for unfair competition under their common-law rights to those trade names. The trial court made detailed findings of fact, concluding that the words "Minral Meal" used by Sargent & Company, and "Omalass" used by VyLactos, were descriptive. The trial court found specifically that there had been no actual confusion and no reasonable probability of confusion between the products manufactured by Sargent & Company and VyLactos Laboratories on the one hand and the defendant's products on the other. Upon these factual findings the court concluded as a matter of law that the plaintiff in neither action was entitled to recover, and dismissed the complaints.

Error is assigned upon the following grounds.

First, that Sargent & Company's trademark "Minral Meal" was shown to have acquired a secondary meaning prior to defendant's use of the words "Mineral and Meal", and hence the defendant was barred from using the latter words as descriptive of its product;

Second, that Sargent & Company having adopted the trade-mark consisting of an illustration of a hog, bag, and spoon, and registered it with the State of Iowa and used it extensively prior to the defendant's use of such a picture in promoting the sale of its product, that the use by the latter of a similar picture was a violation of Sargent & Company's rights under the statute of Iowa and its common-law right to the exclusive use of the illustration;

Third, that the defendant in marketing its product designated "Mineral and Meal" in sacks similar in design to those used by Sargent & Company, and with a picture thereon of a hog and two pigs with spoons, dancing around an open sack, wrongfully appropriated Sargent & Company's trademarks and designs;

Fourth, that since the evidence showed that the defendant hired a number of Sargent & Company's employees who actively participated in the development by defendant of its competing products, a design was thereby demonstrated to have existed on the part of defendant to deliberately take away Sargent & Company's business by the use of their knowledge of Sargent's customers and the similarity of the designs placed upon defendant's product with the accompanying words "Mineral and Meal";

Fifth, that the court erred in not holding that there was a strong likelihood of confusion between the defendant's use of the term "Drimolas" and the plaintiff's use of the term "Omalass";

Sixth, that the trial court erred in not holding that the defendant encroached upon and intended to encroach upon the good will and trade-mark rights of plaintiff VyLactos by using the same color scheme on the bag in which it marketed its product "Drimolas";

Seventh, that the trial court erred in not holding that defendant intended to and did deceptively palm off its inferior and cheaper products on farmers as the plaintiffs' products; and

Eighth, that the trial court ignored the express provisions of the Iowa Code which merely require imitation of state registered marks as a prerequisite to relief.

Those questions will be taken up in the order stated.

An examination of the record discloses that the trial court's finding that the terms "Minral Meal" and "Mineral and Meal" are descriptive is well supported by the evidence. But it is well established that although Sargent & Company's trademark

"Minral Meal" may be descriptive and not entitled to protection by reason of its registration or at common law, yet if the mark has been shown to have acquired a secondary meaning, it would be entitled to protection under the common law. As stated in Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 335, 59 S.Ct. 191, 201, 83 L.Ed. 195:

"Here we have a secondary meaning to the descriptive term, 'Nu-Enamel.' This establishes, entirely apart from any trade-mark act, the common law right of the Nu-Enamel Corporation to be free from the competitive use of these words as a trade-mark or trade name. As was pointed out in the Davids case [Thaddeus Davids v. Davids Mfg. Co., 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046], in considering the ten-year clause of the 1905 act, 15 U.S.C.A. § 85, this right of freedom does not confer a monopoly on the use of the words. It is a mere protection against their unfair use as a trade-mark or trade name by a competitor seeking to palm off his products as those of the original user of the trade name. This right to protection from such use belongs to the user of a mark which has acquired a secondary meaning. He is, in this sense, the owner of the mark."

See also Barton v. Rex-Oil Co., 3 Cir., 29 F.2d 474; Reardon Laboratories v. B. & B. Exterminators, 4 Cir., 71 F.2d 515; Anheuser-Busch v. Budweiser Malt Products Corp., 2 Cir., 295 F. 306; Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 4 Cir., 254 F. 553; Computing Scale Co. v. Standard Computing Scale Co., 6 Cir., 118 F. 965; Coca-Cola Co. v. Koke Co., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189.

That a trade-mark may, although originally descriptive, become possessed of a secondary meaning was recognized in the following language in Coca-Cola Co. v. Koke Co., supra:

"Whatever may have been its original weakness, the mark for years has acquired a secondary significance and has indicated the plaintiff's product alone."

But it is also well established that if the term or mark continues to be descriptive, although long used, its owner will not acquire a monopoly in its use. In denying a claim for secondary meaning of a descriptive trade name which had long been used, the court in Computing Scale Co. v. Standard Computing Scale Co., supra, noted that the weight of the evidence showed in that case that the name's trade meaning accorded with its primary signification and therefore instead of ever standing for any manufacturer, it always stood for a class of articles—"In short, the name stands for a machine, and not for a maker." [118 F. 970.] And in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, where the claim was made that because of long use of the name "Shredded Wheat", those words had acquired the secondary meaning of shredded wheat made by a particular manufacturer and could not be used by another, the Supreme Court said:

"There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term 'shredded wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done. The showing which it has made does not entitle it to the exclusive use of the term shredded wheat but merely entitles it to require that the defendant use reasonable care to inform the public of the source of its product."

The trial court made no specific finding on the question of whether the trademark "Minral Meal" had acquired a secondary meaning, but it did make a definite finding that the term was descriptive at all

times. That finding we approve upon the record. Otherwise stated, the trial court concluded that the term "Minral Meal" primarily referred to and designated the product and not the producer. And while there was evidence in the record from which the court could possibly have found that the trade-mark had come to denote the producer, Sargent & Company, yet there was ample factual justification for the trial court's conclusion that it had not and continued to merely describe the product. Under those circumstances, the findings preclude the application of the secondary meaning rule.

◼ But assuming, as Sargent & Company contends, that by its long use of the words "Minral Meal" those words had acquired a secondary meaning as a type of feed produced by Sargent & Company alone, would that justify a holding that Sargent & Company was entitled to a monopoly in the use of words of similar import such as "Mineral and Meal"? We do not think that such result would necessarily follow. Under the rule laid down in the Armstrong case, supra, heretofore quoted, when the words are not protected by a valid statutory trademark, the protection afforded by the common law "does not confer a monopoly on the use of the words. It is a mere protection against their *unfair* use as a trade-mark or trade name by a competitor seeking to palm off his products as those of the original user of the trade name." (Italics ours.) Further in the same connection it is stated: "When a name is endowed with this quality, [a secondary meaning] it becomes a mark, entitled to protection. The essence of the wrong from the violation of this right is the sale of the goods of one manufacturer for those of another." The essence of the wrong is therefore the unfair use of an identical or similar mark. Sometimes full protection cannot be given from unfair encroachment without prohibiting entirely the use of words of similar import. See Barton v. Rex-Oil Co., 3 Cir. 29 F.2d 474. But where, as in this case, no wrongful intent is established and the finding is justified that no one has been deceived or is likely to be led to believe that the product

of one manufacturer is the product of the other, the essence of the wrong does not exist and a necessary basis for injunctive relief is absent.

◼ On the question of whether the trial court erred in not finding that the use of the illustration of the hog, bag and spoon by defendant was a violation of Sargent & Company's right to exclusive use of such illustration—the trial court found that the illustration was not always used by Sargent & Company on its product; that the use of such illustrations was very prevalent in the industry and they were used by many manufacturers of feed for hogs. It further found that the manner of the use of the illustration was not deceptive and that no one was led to believe, by the use of this picture, the design of defendant's advertising or the sacks in which its product was sold, that defendant's product was that of the plaintiff, or that there was any reasonable likelihood that such confusion, mistake or deceit would result. Since in our judgment the evidence justified those findings, there was no error in the court's conclusion.

Although Sargent & Company contends that the testimony of witnesses Mitchell, McElroy and Voss is to the contrary, yet each of those witnesses states unequivocally that there was no confusion in his mind as to whether the Welco product was the Sargent product, or vice versa. The conclusion might have been reached from the evidence of those witnesses and others that the defendant's product was represented or understood to have been substantially the same type of stock feed as that of the plaintiff, but that question was not the issue. The question was whether the defendant by the use of the words "Mineral and Meal" in connection with its trademark "Sweet as Honey" did or could palm off its product for that of the plaintiff.

◼ The third and fourth contentions advanced by Sargent & Company to the effect that the trial court erred in not reaching the conclusion that defendant's actions constituted unfair competition are answered by what has been heretofore said regarding the court's finding that there was

no confusion, deception or mistake, or likelihood of either.

On the question of whether there was a strong likelihood of confusion between the VyLactos product "Omalass" and defendant's product "Drimolas", the trial court found specifically that both products were the result of the knowledge in the livestock feed industry that the inclusion of molasses in such feeds was productive of beneficial results and that for a number of years manufacturers of livestock feeds had manufactured feeds with molasses as an ingredient. Such feeds are known as molasses-type feeds. Those manufacturing such feeds usually and generally designated the particular feeds or feed ingredients by a particular name or mark or other designation. The court found from the evidence that plaintiff VyLactos' trademark "Omalass" was intended to signify that molasses was a component part or an ingredient of the product, and that defendant's trade-mark "Drimolas" was intended to signify the same thing. The court found that those engaged in the distribution of livestock feeds and ingredients for livestock feeds, and the purchasers of such feeds, knew and understood that the use of "malass" or "molas" or similar words in connection with livestock feeds meant that molasses was a component part thereof. In other words, the court found that both words were descriptive of the product. The trial court further specifically found that the use of the word "Drimolas" by the defendant in connection with the molasses ingredient manufactured by it did not cause confusion or mistake between the defendant's product and that produced by the plaintiff, nor that any deceit was practiced, or that mistake or deception was reasonably likely to result. Those findings the record supports and we may not disturb.

The further finding that there was not sufficient similarity in color schemes, designs and inscriptions on the sacks to cause confusion is supported by an examination of the record and the exhibits before us.

Plaintiffs' further contention that all of the facts and circumstances should be taken together in determining the absence or existence of unfair competition is correct. The argument is advanced that the court approached the whole matter on a piecemeal basis and having found that each alleged impropriety did not justify a finding of unfair competition, that the court failed to consider each matter in connection with the others. But we do not so construe the court's findings. The trial court did treat each specific issue separately in its findings, but it also incorporated therein the general finding heretofore noted that there had been no mistake, confusion or deceit, and the evidence disclosed no likelihood that any could reasonably result from the defendant's practices. Although, as is very frequently the case, there was evidentiary justification for a different conclusion on some of the issues, yet there was adequate evidentiary justification for the general findings. Under those circumstances those findings should not be overturned.

The question of whether the Iowa Code gives to the plaintiffs rights and remedies in addition to that afforded by the general rule of the common law and the trade-mark laws of the United States is said to present a novel question. No authorities are referred to as determining the matter. But it is conceded that the plaintiffs' and defendant's operations are both very clearly interstate. The plaintiffs operate in fifteen states on a very extensive scale. The defendant's operation extends to twelve of these same fifteen states. The subject matter of the action is therefore clearly interstate. Congress has entered and pre-empted the field of trade-mark law in its application to interstate commerce. Although the defendant raised the question of the jurisdiction of a Federal District Court to hear and determine plaintiffs' rights under the Iowa statute in the absence of diversity of citizenship, the plaintiffs did not present to the court below any request that that court grant either of them relief under the Iowa statute in the State of Iowa alone. Nor do they do so here. Their claim was and is that the Iowa statute should be applied extraterritorily to interstate commerce and in supersedence to the Federal Trade-Mark

Laws and recognized general common law principles. Under these circumstances we will not speculate upon the possibility of a federal court granting relief in the State of Iowa alone under the provisions of the Iowa statute in the absence of diversity of citizenship, but will apply the Federal Law of Trade-Marks to this case involving only interstate commerce. And it is not suggested that the common law of Iowa relating to unfair competition is in any respect different from the common law generally applied to questions of unfair competition. Hence, under the facts and circumstances of this case, the pleading of the Iowa statute did not enlarge plaintiffs' rights.

Finding no error, the judgment of the trial court should be and is affirmed.