520 F.Supp. 629 (1981)
VITEK SYSTEMS, INC., Plaintiff,
v.
ABBOTT LABORATORIES, INC., Defendant.
No. 80-0103C(B).
United States District Court, E. D. Missouri, E. D.
July 23, 1981.
Lionel L. Lucchesi, St. Louis, Mo., Harvey A. Gilbert, Hazelwood, Mo., for plaintiff.
Thomas E. Wack, John H. Quinn, III, St. Louis, Mo., for defendant.

MEMORANDUM AND ORDER
REGAN, District Judge.
In this action Abbott Laboratories (Abbott) is charged with federal and state trademark infringement and unfair competition by Vitek Systems, Inc. (Vitek), a wholly owned subsidiary of McDonnell Douglas Corporation (McDonnell). The issue is whether Abbott's use of its MS-2 mark either alone or in conjunction with its established corporate logo infringes upon Vitek's AMS mark or results in unfair competition.
Vitek and Abbott are competitors in the manufacture and marketing of automated computerized microbial testing equipment. These instruments, which came upon the market relatively recently, are promoted and sold in the same market, namely, clinical laboratories and acute care hospitals. The Vitek instrument was developed by McDonnell in the early 1970s based on the engineering and technology expertise it had gained in the development of a device used on manned space flights. Abbott's microbiology system was developed through its Diagnostic Division, commencing in 1973, working in conjunction with two entrepreneurs who had invented the instrument.
In 1974, following an in-house contest at McDonnell, the name "AutoMicrobic System" was chosen for its instrument. The following year, the MDC (McDonnell) Trademark Committee having decided that the initials "AMS" also be used to identify the instrument, McDonnell filed trademark *630 registration applications on July 9, 1976 for both "AMS" and "AutoMicrobic System." The AMS registration was granted on April 5, 1977.
Theretofore, in April 1974, McDonnell contracted with Fisher Scientific Company (Fisher), a distributor of clinical laboratory products, to market the instrument. During the approximately four years the Fisher contract was in effect, a total of only seven instruments were delivered by McDonnell to Fisher. Fisher did not make any sales, although a very few of the instruments which had been placed with prospective customers for testing and evaluation were ultimately purchased by them.
On June 8, 1977, McDonnell formed Vitek, pursuant to its decision to phase out Fisher as well as the McDonnell identification of the instrument. After Fisher was terminated as the distributor (by mutual agreement), Vitek (to which McDonnell had assigned all its patent and trademark rights relating to the instrument) assumed the marketing functions.
In May, 1976, the McDonnell instrument was first introduced to the trade by Fisher (as the AutoMicrobic System) at a meeting of the American Society of Microbiologists in Atlantic City, New Jersey. A great amount of interest was generated, but no sales resulted. The instrument involved had been "grandfathered" by being hurriedly shipped in interstate commerce to avoid the requirements of the Medical Device Amendments of 1976 (21 U.S.C. § 301 et seq.) which became effective May 28, 1976. However, because most of the test kits utilizable with the instrument required premarket clearance from the Food and Drug Administration (FDA) under the 1976 Act (a very slow process), the marketability of the instrument was severely limited for some time.
The Distributorship Agreement between Fisher and McDonnell described the product as a "Semi-Automated Microbial Laboratory (SAML) instrument and system." Nowhere in the 41 page Agreement and Exhibit A thereto or in the Supplemental Agreements No. 1 (February 18, 1976), No. 2 (Feb. 27, 1976), No. 3 (April 15, 1976), No. 4 (July 23, 1976), and No. 5 (Nov. 26, 1979), was the product described otherwise. And even in Supplemental Agreement No. 6 (Dec. 26, 1977) in which Vitek (as assignee of McDonnell) first appeared as a party, and in Supplemental Agreement No. 7 (January 26, 1978) the product was still described as a Semi-Automated Microbial Laboratory (SAML) instrument and system. It was not until February 27, 1978, in the preamble to a Memorandum of Understanding relating to a new agreement between Vitek and Fisher, that "AMS" was substituted without explanation for "SAML" and used in the body of the Memorandum.
During Fisher's tenure as exclusive distributor, the marketing of the instrument was handled through its "AutoMicrobic Division." For the most part, Fisher referred to the instrument as the "AutoMicrobic System." At other times it was referred to as the "AMS AutoMicrobic System." Fisher stressed the merits and benefits of the "system." In its advertising and promotion of the instrument, Fisher would on occasions use its own name and logo, frequently in conjunction with the name and logo of McDonnell.
In May, 1978 a year after Vitek was formed, it was decided that with sales being "nil" (in the language of a written "Communications Plan" of Vitek's newly employed Director of Marketing and its Manager of Marketing Services) to de-emphasize McDonnell's relationship with the AutoMicrobic System, including the removal of the name and logo of McDonnell. Pursuant to that decision, a Chicago advertising firm was employed to create a public image of Vitek and its instrument. As the result, emphasis was placed upon the name "AMS" and Vitek as its source beginning in late 1978.
The name "AMS" has been associated over the years with many products and services (of a nature different from the instrument in question). In fact, one of McDonnell's own divisions (the Health Services Division of the McDonnell Douglas *631 Automation Company) for a period of time used and stressed the name "AMS" for its "Account Management System" in dealing with hospitals and other health care institutions until instructed to change the name. Those in charge of the Health Services Division had never heard of Vitek's AMS instrument.
Abbott, a very large company, has been well known for many years in the medical and health field as a purveyor of pharmaceuticals. Beginning in 1963, it decided to diversify into other related health care areas, including the manufacture and sale of diagnostic equipment. The Abbott logo, which was created in the late 1950s, has been used continuously on virtually all its products as well as on its correspondence and its advertising and promotional materials since before 1960. This logo has attained wide recognition as the symbol of Abbott products.
Following a trademark search which indicated that the mark was available, Abbott contemplated the use of the initials "AMS" for its instrument. However, just prior to the first scheduled trade display of the instrument in May, 1976, when it discovered (from a Fisher mailing) that "AMS" was being used on the McDonnell AutoMicrobic System it decided to forego the use of that name. Abbott's Trademark Department then ascertained that the mark "MS-2" was available for use on the instrument. In the trademark search by an independent firm in connection with that mark no reference to McDonnell or Fisher was found. Abbott had first used the name "MS-2" in 1971 in connection with a cardiscope it produced. This, of course, was long prior to the events in issue in this case.
In November 1976, Abbott applied for registration of its "MS-2" mark. It subsequently developed that in mid-1976 an affiliate of Rohm & Haas Company had filed a trademark registration for the mark "MS-2" for use on a diagnostic spectrophometer, claiming a first use on May 11, 1973. In view of that, Abbott considered for a time changing its mark to "QS-2", but instead negotiated an agreement with Rohm & Haas in early 1977 whereby Abbott was allowed to continue the use of its possibly infringing "MS-2" mark on its instrument with the provision that it would (as it customarily did) display its logo on the instrument and in its literature to distinguish the source of its product from Rohm & Haas.
The Abbott instrument was first displayed in Europe at a trade show in Cambridge, England in September 1976 and in this country at a trade show in Los Angeles, California, during October 1976 as the "Abbott MS-2." The Vitek (then the McDonnell) instrument was displayed at this Los Angeles show as the McDonnell-Fisher "AutoMicrobic System." However, not until May, 1979, was Abbott able to effect any sales of its "MS-2" in this country because the instrument had not earlier been cleared by the FDA for clinical use under the Medical Services Act of 1976.
We are convinced by the great weight of the credible evidence that there is no likelihood of confusion between Vitek's "AMS" mark and Abbott's "MS-2" mark either alone or in conjunction with the Abbott logo. The instruments themselves differ in appearance and are easily distinguishable. Vitek's name appears on the face of its AMS instrument. On the nameplate on the face of the MS-2 instrument, the Abbott name as well as its logo appears. The Abbott mark is commercially displayed only in connection with its corporate name. And when both the logo and the mark appear in proximity, the logo is contrasted in spacing, size, color and style with the mark. On the other hand, the letters of the AMS mark are evenly spaced and are uniform in size, color and style. In addition, one of its four model numbers appears on the Vitek instrument, whereas Abbott shows no model number. The supplies for the two instruments (disposable laboratory cassettes which are a necessary part of their function) are not interchangeable. None of the "disposables" sold by either party can be used on the competing instrument.
It is clear to us that the buyers of these expensive instruments are sophisticated and knowledgeable professionals whose buying *632 process is a long and complex one. These instruments are never sold on a single sales contact, and impulse buying is unknown in this field. Cf. Fisher Stoves, Inc. v. All Nighter Stove Works, 626 F.2d 193, 194 (1 Cir. 1980). One of the marketing methods employed by both Vitek (and its predecessor) and Abbott is to display their products at trade shows in conjunction with meetings of the professionals in the field. At these shows, floor space is assigned to each of the exhibitors. In Abbott's booths, its name and logo are prominently displayed. And Vitek's booths clearly identify its instrument with the Vitek name and logo. Various marketing tools are employed in conjunction with the trade shows to acquaint potential buyers with Abbott's product and to create sufficient interest for further contacts with Abbott. So, too, Vitek's booths, which obviously are unrelated to Abbott's, are operated in much the same manner.
Other marketing methods used by each of the parties are advertisements in technical journals, mailings to potential customers, and direct salesmen's calls. Abbott's advertising of its MS-2 instrument contains its name and telephone number. Similarly, Vitek's advertisements of the AMS clearly identify the source. The Abbott logo appears in each of its advertisements and in the direct mailings, but not in close conjunction with the MS-2 mark. As for the salesmen's calls, most of them are made only after a customer has earlier expressed interest in the product. The customer is apprised of the identity of the manufacturer. The sales presentation by the salesmen typically includes such techniques as an audio-visual display (that specifically mentions the manufacturer's name) and delivery of the instrument to the customer for prolonged demonstration and testing, as well as a written proposal and a cost justification. Vitek, but not Abbott, commonly uses a rental program to give the customer a period of time to evaluate its instrument before the ultimate purchasing decision is made.
A number of persons in the potential customer's institution, including microbiologists, pathologists and laboratory technicians, are usually involved in making recommendations before the final decision to purchase the instrument is made by the administrator or board. The salesman's function is to provide the highly technical information desired by the customer's personnel, as well as to stress the reputation of the manufacturer and its ability to provide on-going service. Typically, five to ten sales contacts extending over a period of time as long as a year or more are required before the instrument is budgeted for purchase and a sale is effected.
Bearing in mind the level of sophistication of the relevant purchasers of these relatively high-priced single purchase instruments, each of which bears the name of the manufacturer, as well as the differences in their appearance, it is inconceivable to us in light of the evidence as a whole that there is any reasonable likelihood of confusion in the mind of a purchaser either as to the source of the product or as to the product itself by reason of the mark adopted and used by Abbott. Whatever "confusion" there might have been was not attributable to the trademarks in issue. FS Services, Inc. v. Custom Farm Services, Inc., 471 F.2d 671 (7 Cir. 1972). We note that, unlike the situation in cases where the defendant has copied the configuration and appearance of the competing product itself (cf. Truck Equipment Service Co. v. Fruehauf Corp., 536 F.2d 1210 (8 Cir. 1976)), or its advertising materials. Vitek makes no claim that Abbott has done so.
Although contrary to its answers to interrogatories stating that it was aware of no instances of actual confusion, Vitek claimed at trial there were in fact incidents of actual confusion. We find the testimony submitted in support of this claim to be ambiguous at best and not credibly probative of the asserted confusion. Significantly, the surveys conducted by Vitek's advertising agency not only contain no reference whatever to any possible confusion on the part of any potential customer but implicitly assume the absence of confusion. And there is no credible evidence that Vitek or its *633 assignor lost any sale by reason of any customer confusion, nor is there any evidence whatever that any customer purchased an MS-2 instrument believing it was an AMS instrument. Admittedly, there is no contention that Abbott ever attempted to pass off the Vitek instrument as its own.
In the earlier stages of the promotion of the Vitek instrument the name most commonly used for it (and stressed) was "AutoMicrobic System." The initials "AMS" in our judgment were intended simply as an abbreviation or a shorthand way of referring to "AutoMicrobic System". It was not until McDonnell and Vitek realized that Abbott's "MS-2" instrument was a very formidable competitor in the automated microbiology field that Vitek began to put more and more emphasis on "AMS," its literature referring to the instrument as the "AMS AutoMicrobic System" (usually with the "AMS" in much larger type than the "AutoMicrobic System").
The parties have argued at length the nature of the Vitek marks, that is, whether they are to be considered descriptive, suggestive or arbitrary and fanciful. A descriptive term identifies a characteristic or quality of an article or service. A suggestive term suggests rather than describes some characteristic of the article to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of that article. Arbitrary or fanciful terms bear no relationship to the product or service with which they are associated.
Abbott urges that Vitek's mark is descriptive, in which case the burden would be upon Vitek to establish secondary meaning of the mark. "Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin." Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3 Cir. 1978). As stated in RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1059 (2 Cir. 1979): "To be entitled to the benefit of the secondary meaning doctrine, a plaintiff must establish that the purchasing public has come to associate certain words, symbols, collocations of sales and designs, or other advertising materials or techniques, with goods from a single source." And see Truck Equipment Service Co. v. Fruehauf Corp., 536 F.2d 1210, 1219 (8 Cir. 1976).
Vitek contends not only that its marks are not descriptive but that in any event they have acquired a secondary meaning. It is, of course, true, as Vitek points out, that the term "automicrobic" is not to be found in the dictionary. However, those in the relevant field at once and without resort to imagination recognize the term as meaning automated microbiology. So, too, "AMS" as applied to microbiology instruments is obviously recognizable as an abbreviation of "AutoMicrobic System" and so is not an arbitrary or fanciful term.
Factors relevant to the issue of secondary meaning include the amount and manner of advertising, the volume of sales, the length and manner of the mark's use and direct consumer surveys and testimony. Unquestionably, Vitek and McDonnell have expended a very substantial amount for advertising and promoting the AutoMicrobic System (AMS) instrument. However, it was not until late 1978 that the marketing emphasis on the "AMS" mark began. In fact, the market for both the Vitek and Abbott instruments was still in the embryonic stage when this suit was filed, and certainly so at the time Abbott adopted its MS-2 mark. On the other hand, considering the limited number of potential customers for the product, it is clear to us that in spite of the very short period of time the respective instruments were on the market, such customers associated AMS only with Vitek and also associated MS-2 only with Abbott, and in that sense each mark may be said to have a secondary meaning. The buyer's choice was between two different instruments, each of which had its own separate identity and known source. Under no sense of the word was Abbott trading on the Vitek name or "reputation." And since, as we have found, there is no reasonable likelihood of confusion (or actual confusion), *634 the issue of secondary meaning, as such, is mooted.
Vitek has vigorously attacked the bona fides of Abbott in adopting and continuing to use its MS-2 mark both alone and in conjunction with the Abbott logo. We reject this claim and expressly find that the mark was chosen and is used in good faith with no intent to infringe upon the Vitek mark. As we have held supra, no infringement actually resulted from the use of the Abbott mark and logo.
Abbott has asserted the defense of laches. This is based on what is claimed to be McDonnell's and Vitek's delay in instituting this action. On November 6, 1976, McDonnell's corporate counsel, in a letter to Vitek stated that the Abbott "MS-2" mark infringed upon the "AMS" mark. In reply, Abbott's in-house counsel denied infringement and advised McDonnell that to avoid any misunderstanding, Abbott was seeking trademark registration of the "MS-2" mark. Nothing further was heard from McDonnell until November 4, 1977, a year later. Again the parties stated their positions respecting the alleged infringement. In the interim, Abbott had began use of the "MS-2" mark in its instrument and literature.
Publication of the trademark application was made on February 7, 1978 in the Official Gazette of the Patent and Trademark Office. This publication is available to corporate patent departments, and we have no doubt it was received by McDonnell. However, no opposition proceeding was filed by McDonnell or Vitek in the Patent and Trademark Office. To the knowledge of McDonnell and Vitek, Abbott had continued to display the "MS-2" mark and its logo at various trade shows, and by late 1978 McDonnell and Vitek recognized Abbott as a potent market force. Domestic advertising expenditures by Abbott through 1979 were over $650,000.
The instant suit was filed in January 1980. In the period from November 4, 1976 to January, 1980, neither McDonnell nor Vitek had made any objection to Abbott's use of the "MS-2" mark. No evidence was presented to justify the delay in instituting this action nor for the failure to file opposition proceedings in the Patent and Trademark Office. We find that Abbott was prejudiced by the delay.
Mere delay does not, of course, suffice to establish laches. However, when, as we have found, the alleged infringer has acted in good faith with no intent to defraud or to trade upon the other's mark or reputation, and substantial prejudice is shown, delay in taking available action is available as a defense to an equitable claim for an injunction. Saratoga Vichy Spring Co. Inc. v. Lehman, 625 F.2d 1037 (2 Cir. 1980).
Having found there is no reasonable likelihood of confusion between the Vitek and Abbott mark nor of any injury to Vitek's "reputation", it follows that without regard to the issue of laches Vitek is not entitled to an injunction nor to cancellation of the Abbott trademark registration. We also find no basis in the credible evidence for a finding of unfair competition. Judgment will be entered in favor of Abbott on all counts of the complaint. Defendant has counterclaimed for a declaratory judgment with respect to the validity and scope of the Vitek AMS mark. We find that the mark is valid when applied to microbiology instruments. The judgment will so declare.
The foregoing MEMORANDUM constitutes our findings of fact and conclusions of law.

JUDGMENT
The Court having this day entered its Memorandum and Order, NOW THEREFORE, in accordance therewith and for the reasons therein stated, IT IS HEREBY ORDERED, ADJUDGED and DECLARED
(1) That defendant's MS-2 mark does not infringe upon the mark of plaintiff,
(2) That defendant's use of its mark, either alone or in conjunction with its logo, does not result and has not resulted in unfair competition with plaintiff nor infringe upon plaintiff's AMS mark,
*635 (3) That plaintiff's claims for injunctive relief against the use and for cancellation of defendant's MS-2 mark be and are hereby denied,
(4) That plaintiff's complaint and each of Counts I through V inclusive thereof be and the same are hereby dismissed with prejudice and that plaintiff take nothing by this action.
(5) That plaintiff's AMS mark is valid as applied to microbiology instruments, and
(6) That costs herein be and are hereby assessed against plaintiff.