The UNITED STATES
JAYCEES, Plaintiff,

v.

COMMODITIES MAGAZINE, INC., now
doing business as Oster
Communications, Inc., Defendant.

No. C 85–2018.

United States District Court,
N.D. Iowa, E.D.

Jan. 2, 1987.

Thomas D. Hobart, Iowa City, Iowa, Carl D. Hall, Paul H. Johnson, Tulsa, Okl., for plaintiff.

Bruce McKee, Mark D. Hansing, Des Moines, Iowa, for defendant.

## DECISION ON THE MERITS

HANSEN, District Judge.

This case is before the court on plaintiff's and defendant's cross-motions for summary judgment. Both sides have filed numerous briefs. The parties have agreed to defendant's statement of undisputed facts. Plaintiff's supplement to defendant's statement of undisputed facts is not contradicted by defendant. Although both sides have urged this court to grant summary judgment in their favor, it is clear that a genuine issue of material fact remains to be determined: likelihood of confusion. The court, having notified the parties of the inappropriateness of summary judgment, now enters the following decision on the merits of the case, having obtained the consent of the parties to do so without further hearing.

## FINDINGS OF FACT

1. Plaintiff, the United States Jaycees, is a non-profit corporation of the State of Missouri, having its national headquarters in Tulsa, Oklahoma.

2. Since September, 1938, plaintiff has published its magazine under the trade name "FUTURE." The magazine has a bi-monthly distribution of approximately 270,350 copies and is distributed to Jaycees' members and non-members in every state of the United States.

3. Plaintiff is the owner of the trademark "FUTURE" and the registration thereof in the United States Patent and Trademark Office, Registration No. 750,-911, registered June 11, 1963. That registration is valid and uncancelled.

4. Defendant Oster Communications, Inc. is an Iowa corporation with its office in Cedar Falls, Iowa. (Since this action was filed, defendant Commodity Magazine, Inc. has changed its name to Oster Communications, Inc.)

5. Defendant, in September, 1983, began to publish and distribute "FUTURES: the magazine of commodities and options" to subscribers and newsstands. Distribution of defendant's magazine is much smaller than that of plaintiff's, with approximately 56,102 copies distributed monthly.

6. Defendant's attorney received the results of a trademark search on the word "FUTURES" which revealed plaintiff's registration before the first issue of "FUTURES: the magazine of commodities and options" was published. Sensing no conflict between the titles, defendant's attorney did not inform defendant of the similarity with plaintiff's title. Defendant first learned of the plaintiff's title when plaintiff objected to defendant's use of the title a few months after the first publication run of defendant's magazine. Despite the similarity of the titles, defendant continues to distribute its publication.

7. The similarity of the plaintiff's and defendant's magazine titles has resulted in the commingling of the two publications in the postal processing of undeliverable return mail. The only other evidence of confusion is one phone call received by plaintiff from a woman who inquired about a subscription to "FUTURES" magazine. When asked for clarification, she responded that she wished to subscribe to the magazine that dealt with commodities. Plaintiff directed her to defendant's magazine.

8. The channels of trade and methods of marketing utilized by plaintiff are distinctly different than those utilized by defendant.[1] The vast majority of plaintiff's readership is composed of members of its organization who receive the magazine for a nominal fee of $1.00 per year. Defendant has no such "membership" other than subscribers who seek out defendant's publication. Plaintiff sells no magazines at newsstands as does defendant.

9. The court finds that, in this case, the possibility of confusion on the part of consumers is not sufficiently substantial to create a likelihood of confusion, even in light of plaintiff's evidence of actual confusion.

## DISCUSSION

Plaintiff brings this action for trademark infringement, unfair competition and false designation of origin under Title 15, U.S.C. §§ 1051–1127 and for injury to business reputation and dilution of the distinctive quality of a trademark under section 548.-11.2 of the Iowa Code. Jurisdiction is based on 28 U.S.C. § 1338(a) and (b), and 15 U.S.C. § 1121, with pendant jurisdiction of the state claim.

In short, plaintiff claims that defendant's use of the title "FUTURES: the magazine of commodities and options" creates a likelihood of confusion with plaintiff's registered title "FUTURE," and in doing so, violates plaintiff's rights as a registrant of a trademark. In addition, plaintiff claims that defendant's magazine title dilutes the distinctive quality of plaintiff's title.

### *Trademark Infringement*

■■■ Plaintiff alleges that defendant has infringed upon its trademark in violation of 15 U.S.C. § 1114(1), which provides that:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause

---

1. Approximately 99.8% of plaintiff's magazine is distributed bi-monthly to members of the Jaycees for a nominal fee of $1.00 per year. The remaining .2% is distributed to sponsors, subscribers, and people who attend Jaycee functions. (Plaintiff's interrogatory no. 25.) Defendant, on the other hand, distributes 92.8% of its monthly magazine to subscribers, 4.2% to newsstands, .4% to foreign countries, and the remaining 2.6% to its quality control department, sponsors, seminars and other miscellaneous uses. (Defendant's interrogatory no. 9.)

confusion, or to cause mistake, or to deceive

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In order to make out a claim of trademark infringement, plaintiff must demonstrate that defendant's use of a similar magazine title is likely to cause confusion as to the source of the product among an appreciable number of purchasers. 15 U.S.C. § 1114(1)(a); *Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir. 1982); *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1090–91 (8th Cir.1980). Actual confusion is not essential to a finding of infringement. *Squirtco v. Seven-Up Co.*, 628 F.2d at 1091, *citing Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958). However, a mere possibility of confusion is not enough; "there must be a substantial likelihood that the public will be confused." *Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d at 192, *quoting Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194 (1st Cir. 1980). The resolution of the issue requires the court to examine many factors to determine whether there is a likelihood of confusion. *Vitek*, 675 F.2d at 192. Those factors include the similarity of the publications' titles, the intention of Oster Publications, Inc. in choosing its title, the degree of care exercised by purchasers of the magazines at issue, and the existence of any actual confusion. *See WSM, Inc. v. Hilton*, 724 F.2d 1320, 1329 (8th Cir.1984); *Squirtco v. Seven-Up Co.*, 628 F.2d at 1091.

■ In appearance, plaintiff's magazine title "FUTURE" is similar to defendant's main title "FUTURES." They are similar in lettering style, and are composed of an upper-case "F" and lower case letters "uture(s)." However, at this point, the similarities in appearance end. Defendant's title has an "s" which plaintiff's title

does not. The plaintiff's letters are larger than defendant's. Defendant's title includes as a subtitle, "the magazine of commodities and options" in type that is one-fifth the size of the word "FUTURES." Plaintiff's title is accompanied by the statement "Official Publication of the United States Jaycees" in print that is one-tenth the size of the title "FUTURE."

On a practical level, the minutiae of print size similarities and differences lose their punch. In order for an appreciable likelihood of confusion to exist, there must be someone in a position to be confused. *See Comidas Exquisitos v. Carlos McGee's Mex. Cafe*, 602 F.Supp. 191, 195 (S.D. Iowa 1985). In comparing the titles, "the comparison should be made 'in light of what occurs in the marketplace,' taking into account the 'circumstances surrounding the purchase of the goods.'" *Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d at 192, *quoting Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). In the case at hand, by scrutinizing the circumstances surrounding the purchase of the goods, it is clear that there is very little likelihood of confusion. Plaintiff's publication is the "Official Publication of the United States Jaycees." As such, it is not sold on newsstands, but is distributed to members of the Jaycees through the mail. (An incidental number of copies are distributed to advertisers, potential advertisers, subscribers who are no longer members of the Jaycees and "friends of the Jaycees.") Defendants' magazine, on the other hand, is distributed mainly to subscribers who request the magazine and pay the $34.00 per year subscription rate. (Some copies are also sold from newsstands.) These different marketing methods employed by defendant and plaintiff in the distribution of their publications substantially preclude the situation in which purchasers would be confused.

Courts within the Eighth Circuit have considered the target group of purchasers in determining whether confusion is likely. Thus, the District Court for the Western District of Missouri observed the discretion

with which purchasers of country music services approach their purchases: "The members of the public who purchase country music entertainment services exercise a degree of care which obviates the likelihood that they will be confused as to whose services they are purchasing." *WSM, Inc. v. Hilton*, 545 F.Supp. 1212, 1217 (W.D.Mo. 1982), *aff'd* 724 F.2d 1320 (8th Cir.1984). Similarly, the District Court in *Vitek Systems, Inc. v. Abbott Laboratories*, 520 F.Supp. 629, 632 (E.D.Mo.1981), analyzed the purchasing process for the products in dispute and found that, even though the products were intended to perform the same scientific analysis, were sold to the same target market and were sold via the same marketing methods, there was no reasonable likelihood of confusion in the mind of the purchaser either as to the source of the product or as to the product itself. Here, considering the general discretion exercised by the members of the public who purchase the Jaycees' publication and the markedly different routes by which defendant's and plaintiff's publications are distributed, there is no reasonable likelihood of confusion between these publications.

The evidence presented by plaintiff of postal clerical errors does not weigh strongly in its favor. The postal system for returning undeliverable mail is not the relevant marketplace for the analysis of likelihood of confusion. *Astra Pharmaceutical Products, Inc. v. Beckman Industries, Inc.*, 718 F.2d 1201 (1st Cir.1983). The only other evidence offered by plaintiff in support of its claim of confusion involved a single phone call received by plaintiff in which the caller wished to subscribe to "FUTURES." When she was asked to clarify, she explained that she was seeking the magazine dealing with commodities. At most, the phone call reveals that the caller was confused as to the source of defendant's magazine. She had not been deceived by the similarity of the titles into seeking defendant's magazine, thinking it was plaintiff's. This proof of confusion does not rise to the level sufficient to support a finding of a likelihood of confusion. "The mere possibility of such confusion, or actual confusion that is de minimis, is insufficient to establish a likelihood of confusion." *Comidas Exquisitos v. Carlos McGee's Mex. Cafe*, 602 F.Supp. 191, 196–7, citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *AMP, Inc. v. Foy*, 540 F.2d 1181, 1185–86 (4th Cir.1976); *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 804 (9th Cir.1970). Further, "the danger of confusion must be sufficiently substantial to constitute a 'likelihood' of confusion." *Comidas, supra*, at 197. The court finds that plaintiff's evidence of actual confusion is de minimis and does not establish a likelihood of confusion.

Turning to the issue of defendant's intention in selecting its title, "FUTURES: the magazine of commodities and options," it is clear that the term "future" is used to describe a type of commodity which is sold or purchased with the prospect of future delivery. "Future" is defined, in part, as "a stock or commodity bought and sold for delivery at a future time ... a contract for the purchase or sale of something to be delivered at a definite future time and at a specified price." *Webster's Third New International Dictionary* (1981). Clearly, there is a strong nexus between defendant's title "FUTURES ...," the general subject matter of defendant's magazine, and the denotative meaning of the word "future" as defined above. Defendant first learned of the similarity between the titles at issue a few months after the defendant's first publication. (Affidavit of Merrill J. Oster, p. 5).[2] Defendant's lack of knowledge of plaintiff's title, coupled with the denotative meaning of the word "future" as used by defendant, help establish defendant's good faith in adopting its title. Even if defendant's attorney's knowledge of plaintiff's title is imputed to defendant, the court finds no intent on the part of defendant to falsely designate the origin of

---

2. The court notes that defendant's counsel performed a trademark search on defendant's title and discovered plaintiff's similar title. Sensing no conflict, defendant's counsel did not report this discovery to defendant. (Defendant's statement of undisputed facts, p. 10.)

its publication or to deceive the public into believing that defendant's magazine was affiliated in any way with plaintiff's magazine.

The evidence offered by plaintiff to show a likelihood of confusion, even when viewed in the light most favorable to plaintiff, fails to establish the likelihood of confusion which is an essential element in an action for trademark infringement.

### Unfair Competition

■ Plaintiff's unfair competition claim is based on Section 43(a) of the Lanham Act which provides that:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). "The purpose of section 43(a) is to create a new federal remedy for the particular kind of unfair competition that results from false designation of origin or other false representation used in connection with the sale of a product." *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1331 (8th Cir.1984).

Plaintiff is entitled to protection under the Lanham Act if it can show that defendant's use of the title "FUTURES" constitutes a false designation of origin or false representation and that the public is likely to be confused by such use. *Metric & MultiStandard Components v. Metric's, Inc.,* 635 F.2d 710, 714 (8th Cir.1980). More particularly, "the key to finding a violation under section 43(a) is a determination that the materials used by the defendant created a likelihood of confusion, deception or mistake on the part of the consuming public." *Metric, supra,* at 714. This court has found that no likelihood of confusion, deception or mistake on the part of

purchasers exists as a result of defendant's acts. The evidence, even when viewed most favorably to plaintiff, does not establish the likelihood of confusion, deception or mistake for which recovery lies under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

### Iowa Code § 548.11

Plaintiff asserts that defendant has violated Iowa Code § 548.11, a statute which entitles the registrant of a mark that has been infringed upon to recover as follows:

1. The registrant of a mark that has been infringed may be granted an injunction against an infringer in accordance with the principles of equity. The court in its discretion may allow the registrant to recover the damages caused by the infringement or the profits of the infringer attributable to the infringement, or both. The court may order any counterfeits or imitations in the possession or under the control of an infringer to be destroyed and in exceptional cases the court may also award reasonable attorney fees to the prevailing party.

2. Likelihood of injury to business reputation or to a trade name valid at common law, or of dilution of the distinctive quality of a mark, whether registered or not registered under this chapter, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Iowa Code § 548.11. Initially, however, plaintiff must show that its mark is "arbitrary, coined, fanciful, or has become distinctive by acquiring a secondary meaning." *WSM, Inc.,* 724 F.2d at 1332. *See also Pioneer Hi-Bred International, Inc. v. Wilson Hybrids, Inc.,* 585 F.Supp. 1 (S.D.Iowa 1982). Upon that showing, Iowa law entitles a party to injunctive relief "notwithstanding ... the absence of confusion as to the source of goods or services." Iowa Code § 548.11.2. Thus, plaintiff has a greater scope of protection under Iowa law than under Federal law, which requires the additional proof of a likelihood of con-

fusion as an essential element. It is at this juncture that the question arises whether the Federal Trademark Act (the Lanham Act) preempts the operation of the Iowa Dilution Statute.

The doctrine of Federal pre-emption, succinctly stated, is as follows:

When federal pre-emption is invoked under the directive of the Supremacy Clause,[3] it falls to this Court to examine the presumed intent of Congress. See *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Our task is quite simple if, in the federal enactment, Congress has explicitly mandated the pre-emption of state law, see *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95–100, 103 S.Ct. 2890, 2898–2907, 77 L.Ed.2d 490 (1983), or has adequately indicated an intent to occupy the field of regulation, thereby displacing all state laws on the same subject, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Even in the absence of such express language or implied congressional intent to occupy the field, we may nevertheless find state law to be displaced to the extent that it actually conflicts with federal law. Such actual conflict between state and federal law exists when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See *Michigan Canners & Freezers Assn., Inc. v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *Fidelity Federal Savings & Loan Assn. v. De la Cuesta, supra.*

*Brown v. Hotel Employees*, 468 U.S. 491, 500–501, 104 S.Ct. 3179, 3184–85, 82 L.Ed.2d 373 (1983). In addition, "if the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182 (1911). In addressing the question whether the Lanham Act has pre-emptive force over various state dilution statutes, the federal courts have reached inconsistent results. *Compare Sargent & Co. v. Welco Feed Mfg. Co.*, 195 F.2d 929, 935 (8th Cir.1952); *Comidas Exquisitos v. Carlos McGee's Mex. Cafe*, 602 F.Supp. 191, 198 (S.D.Iowa 1985); *Mister Donut of America, Inc. v. Mister Donut, Inc.*, 418 F.2d 838, 844 (9th Cir.1969) *with Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir.1980); *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3rd Cir.1975); *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1331–32 (8th Cir.1984).

The intent of Congress in enacting the Lanham Act is expressed in the legislative history accompanying the Act. The legislative history states in part:

BASIC PURPOSES OF TRADEMARK LEGISLATION

The purpose underlying any trademark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trademark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trademark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

\* \* \* \* \* \*

PURPOSES OF THE PRESENT BILL

\* \* \* \* \* \*

This bill attempts to accomplish these various things:

---

3. Article VI, Clause 2 reads in relevant portion: "[T]he Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

1. To put all existing trademark statutes in a single piece of legislation.

2. To carry out by statute our international commitments to the end that American traders in foreign countries may secure the protection to their marks to which they are entitled. Although it has solemnly pledged at inter-American conventions to do so, the United States has failed adequately to protect owners of trademarks in the other American countries doing business with this country. As a result of this inaction, our business organizations have not received reciprocal advantages in the other Americas. The bill remedies this matter, eliminates these sources of friction with our Latin-American friends, and will facilitate mutual trade in this hemisphere. These features make this bill of primary importance now.

3. To modernize the trademark statutes so that they will conform to legitimate present-day business practice.

4. To remedy constructions of the present acts which have in several instances obscured and perverted their original purpose. These constructions have become so ingrained that the only way to change them is by legislation.

5. Generally to simplify trademark practice, to secure trademark owners in the goodwill which they have built up, and to protect the public from imposition by the use of counterfeit and imitated marks and false trade descriptions.

The theory once prevailed that protection of trademarks was entirely a State matter and that the right to a mark was a common law right. This theory was the basis of previous national trademark statutes. Many years ago the Supreme Court held and has recently repeated that there is no Federal common law. It is obvious that the States can change the common law with respect to trademarks and many of them have, with the possible result that there may be as many different varieties of common law as there are States. A man's rights in his trademark in one State may differ widely from the rights which he enjoys in another.

However, trade is no longer local, but is national. Marks used in interstate commerce are properly the subject of Federal regulation. It would seem as if national legislation along national lines securing to the owners of trademarks in interstate commerce definite rights should be enacted and should be enacted now.

There can be no doubt under the recent decisions of the Supreme Court of the constitutionality of a national act giving substantive as distinguished from merely procedural rights in trademarks in commerce over which Congress has plenary power, and when it is considered that the protection of trademarks is merely protection to goodwill, to prevent diversion of trade through misrepresentation, and the protection of the public against deception, a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them.

S.Rep. No. 1333, 79th Cong., 2d Sess. in 1946 U.S.Code Cong.Serv. 1274, 1276–77.

The intent of Congress in enacting the Lanham Act was thus multi-faceted. Two of the purposes of the Act were to enable the public to buy with confidence and to protect the trademark holder from the misappropriation of its mark. Congress sought to accomplish those objectives on a national scale in such fashion as to secure "... to owners of trademarks in interstate commerce definite rights ..." S.Rep. No. 1333, 79th Cong., 2d Sess. in 1946 U.S.Code Cong.Serv. 1277.

In providing greater rights to holders of trademarks than are available to them under the Lanham Act, Iowa Code § 548.11 and other various state dilution statutes frustrate "... the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), by supplanting the uniform and definite rights contained in the Lanham Act, which are intended for those who trade in interstate commerce, with a

checkerboard of differing rights.[4] Since Iowa Code § 548.11, when applied to interstate commerce, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. at 67, 61 S.Ct. at 404, it conflicts with the federal law. In the absence of explicit language that Congress wishes to pre-empt state law, or an indication that Congress wished to "occupy the field of regulation, thereby displacing *all* state laws on the same subject,"[5] *Brown v. Hotel Employees,* 468 U.S. at 501, 104 S.Ct. at 3185 (emphasis added), the state statute may be displaced "... *to the extent* that it actually conflicts with federal law." *Id.* (emphasis added).

The Iowa statute would conflict with one of the major goals of the Lanham Act—uniformity—if it was applied to goods in interstate commerce. Thus, to the extent that Iowa Code § 548.11 regulates interstate commerce, it is preempted by the Lanham Act. *See Sargent & Co. v. Welco Feed Mfg. Co.,* 195 F.2d 929, 935–36 (8th Cir. 1952); *Comidas Exquisitos v. Carlos McGee's Mex. Cafe,* 602 F.Supp. 191, 198 (S.D.Iowa 1985). Both plaintiff and defendants are clearly involved in interstate commerce. Therefore, plaintiff's claim under Iowa Code § 548.11 must be denied.

Finally, plaintiff seeks attorney's fees under 15 U.S.C. § 1117. Under § 1117, a registrant is entitled to recover, among other things, the costs of the action when a violation of the registrant's rights under Title 15 has been established. Here, no such violation has been established. Consequently, plaintiff is not entitled to recover attorney's fees.

### ORDER:

Accordingly, It Is Ordered:

1. Plaintiff's motion for summary judgment, filed December 30, 1985, is denied.

2. Defendant's motion for summary judgment, filed November 14, 1985, is denied.

3. Judgment is entered for defendant on the merits of the case.

---

**4.** M. Handler, *Are the State Antidilution Laws Compatible with the National Protection of Trademarks?,* 75 TMR 269 (1985).

**5.** Clearly, Congress did not intend to preclude all state regulation of trademarks by enacting the Lanham Act. Indeed, the legitimacy of state regulation in limited instances is clear from the Act itself. *See* 15 U.S.C. § 1065.