**PLASTICOLOR MOLDED PRODUCTS, Plaintiff–Counterdefendant,**

v.

**FORD MOTOR COMPANY, Defendant–Counterclaimant.**

**No. CV 85–3863–AK (Tx).**

United States District Court, C.D. California.

April 28, 1989.

Harold L. Jackson, Jackson & Jones, Tustin, Cal., Manuel S. Klausner, Kindel & Anderson, Los Angeles, Cal., for plaintiff-counterdefendant.

Charles R. Mandley, Jr., Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, Ill., Mark S. Lee, Lawler, Felix & Hall, Los Angeles, Cal., for defendant-counterclaimant.

## OPINION

KOZINSKI, Circuit Judge.*

The use of trademarks to identify the source of products is as old as the modern market economy. While the use of marks to signify ownership of goods dates back thousands of years,[1] the trademark as we know it today most likely originated with the medieval guilds of Europe, who often required members to identify their products "to facilitate the tracing of 'false' or defective wares and the punishment of the offending craftsman." F. Schechter, *The Historical Foundations of the Law Relating to Trade-marks* 47 (1925). As markets for durable goods grew larger, and the likelihood of personal contact between manufacturer and purchaser accordingly diminished, trademarks became increasingly important in guaranteeing the source and quality of products.

---

* Sitting by designation pursuant to 28 U.S.C. § 291(b) (1982).

1. Ancient Egyptian wall paintings depict field workers branding cattle. 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 5:1, at 131–32 (2d ed.1984). Greek vases of the fifth and sixth centuries B.C. are sometimes inscribed with the insignia of the potter. P. Goldstein, *Copyright, Patent, Trademark and Related State Doctrines* 276 (2d ed. 1985). While it is possible that such marks could identify the rancher or potter in the event of sale, it is more likely that the marks were meant solely to indicate ownership. *See id.*

As the value of trademarks grew, so did the incentive to appropriate them. A cause of action for copying someone else's trademark and placing it on one's own merchandise was recognized by the early seventeenth century. *See Southern v. How*, Popham 143, 79 Eng. Reprint 1243 (1618). The common law of unfair competition and trademark infringement was imported into American law in the early nineteenth century, and by the middle of that century had become an unquestioned aspect of trade regulation. *See, e.g., Taylor v. Carpenter*, 23 F.Cas. 742 (C.C.D.Mass.1844) (No. 13,-784) (Story, J.).[2] With minor exceptions, trademarks remained a matter of common law until 1946, when Congress passed the Lanham Act and established the current statutory framework for registering marks and redressing claims of infringement.[3]

Throughout the development of trademark law, the purpose of trademarks remained limited and constant: identification of the manufacturer or sponsor of a product. Product features could therefore be divided into two categories. Features that served to identify the source of a product were protected by trademark law, and could not be copied by others. On the other hand, features that served as functional components of a product—if the product could not work or would not be as desirable without them—were unprotected by trademark law. Others were free to copy these features, subject only to whatever protection was available under patent law. In the vast majority of cases, the mutual exclusivity of the categories was airtight. Names of products were source-identifiers, and hence protected; physical attributes of products were functional, and hence unprotected. *See, e.g., Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195 (C.C.P.A.1969) (figure eight configuration of lock functional and therefore unprotected).[4]

Only relatively recently have trademarks begun to leap out of their role as source-identifiers and, in certain instances, have effectively become goods in their own right. When sports fans wear jackets bearing the names of their favorite teams, when listeners of popular music wear T-shirts and buttons emblazoned with the names of musical groups, when followers of fashion wear blue jeans with names of fictitious people sewn into the pockets (a practice which, mercifully, is no longer as popular as it was a decade ago), they are

**2.** Justice Story's tone indicates the importance he ascribed to trademarks as identifications of source. His three-paragraph opinion, which cites no authority other than his own treatise, begins and ends as follows:

I have not the slightest doubt, in the present case, that a perpetual injunction ought to be granted. The case presented is one of unmitigated and designed infringement of the rights of the plaintiffs, for the purpose of defrauding the public and taking from the plaintiffs the fair earnings of their skill, labor and enterprise.

. . . .

... I do not quote cases, to establish the principles above stated. They are very familiar to the profession; and are not now susceptible of any judicial doubt.

*Taylor v. Carpenter*, 23 F.Cas. 742, 744 (C.C.D. Mass.1844) (No. 13,784).

**3.** Congress first provided for the registration of trademarks in 1870, and added criminal penalties for infringement six years later. Act of July 8, 1870, ch. 230, 16 Stat. 198 (1870); Act of August 14, 1876, ch. 274, 19 Stat. 141 (1876). In 1879, the Supreme Court declared the whole enterprise unconstitutional, as exceeding congressional authority under the commerce clause, U.S. Const. art. I, § 8, cl. 3, or the copy-right-patent clause, U.S. Const. art. I, § 8, cl. 8. *Trade–Mark Cases*, 100 U.S. (10 Otto) 82, 25 L.Ed. 550 (1879). Statutes passed in 1881 and 1905 provided only limited trademark protection. Act of March 3, 1881, 21 Stat. 502 (1881) (protecting marks used in international commerce and commerce with Indian tribes); Act of Feb. 20, 1905, ch. 592, 33 Stat. 724 (1905) (protecting only certain trademarks). *See generally* Pattishall, *Two Hundred Years of American Trademark Law*, 68 Trademark Rep. 121, 129–38 (1978).

**4.** In a small number of cases, distinctive non-functional physical attributes of products have been afforded protection. *See, e.g., In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir.1985) (protecting distinctive pink color of fibrous glass residential insulation); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979) (protecting distinctive cheerleading uniform); *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.) (protecting trapezoidal design of twin hopper bottomed grain semi-trailer), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

using registered trademarks and service marks, but not to identify the source of the product. The wearer of a baseball jacket reading New York Mets does not care whether the New York Mets manufactured the jacket, or authorized its production, or are in any way associated with it. He wears it to announce his allegiance. New York Mets may well be a service mark, but in this context it has become a product as well; it is a functional component of the jacket as surely as the material from which the jacket is made.[5]

A small but growing number of cases has recognized this change, and has found no difficulty in applying the source-identifying/functional distinction where trademarks or service marks serve purely as functional features. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir.1980) (insignia of young women's fraternal organization is functional element of jewelry), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed. 2d 956 (1981); *University of Pittsburgh v. Champion Prods., Inc.*, 566 F.Supp. 711 (W.D.Pa.1983) (name of university is functional element of shirts); *Bi–Rite Enters., Inc. v. Button Master*, 555 F.Supp. 1188 (S.D.N.Y.1983) (names of recording artists are functional elements of buttons).

These cases have presented no difficulty for the traditional categories of trademark law because, as in the New York Mets hypothetical, it has been clear that the ordinary purchaser has treated the marks as functional items, not as source-identifiers. This is because the mark and the product have represented radically different industries; reasonable purchasers could not believe or care that the mark holder would be competing in the same market as the product manufacturer. *E.g., Job's Daughters* (fraternal organization and jewelry production); *University of Pittsburgh* (educational/athletic services and clothing produc-

tion); *Bi–Rite Enterprises* (music services and button production). Where the mark and the product come from the same or similar industries, however, the distinction between the categories blurs, because a mark can serve simultaneously as a source-identifier *and* a functional element.

This case presents such a situation. We find ourselves at the intersection of what have been, until now, two mutually exclusive areas of trademark law.

### I. Facts

This lawsuit was brought by Plasticolor Molded Products, Inc., seeking a declaratory judgment of its rights to use Ford Motor Company trademarks on the automobile accessories it produces. Ford then counterclaimed for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) (1982), and under California law. Ford moved for summary judgment, which was denied. *Plasticolor Molded Prods. v. Ford Motor Co.*, 698 F.Supp. 199 (C.D.Cal.1988). On December 29, 1988, the court heard argument on both parties' renewed motions for summary judgment.

### A. The Prior Opinion

In its prior ruling on Ford's first motion for summary judgment, the court made six findings of fact. All are relevant to the motions currently under consideration. For convenience, they are reproduced below.

1. Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan. It has for many decades manufactured, advertised and sold motor vehicles, parts and accessories, including floor mats, mudflaps and step treads (collectively, "floor mats"). It has advertised its automotive parts and accessories extensively throughout the country, and has sold them through independent Ford dealers. In addition, it sells its parts through repair

---

5. As Judge Posner has observed, "In an age when fashion-conscious consumers wear T-shirts emblazoned with the trademarks of consumer products and owners of Volkswagens buy conversion kits to enable them to put a Rolls Royce grille on their car, it is apparent that trade names, symbols, and design features often serve a dual purpose, one part of which is functional in the sense of making the product more attractive, and is distinct from identifying the manufacturer or his brand to the consumer." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir.1985).

shops, discount stores and other mass merchandisers.

2. Ford has long used various arbitrary and distinctive marks to identify its products, including FORD, AEROSTAR, BRONCO, CAPRI, COUGAR, COURIER, ESCORT, EXP, FIESTA, LYNX, MERCURY, MUSTANG, PINTO, RANGER, TEMPO, THUNDERBIRD, and TOPAZ, as well as certain pictorial designs, among them the Mustang "running horse" and Thunderbird symbols. Through Ford's long and extensive use of these trademarks, they have acquired a secondary meaning signifying Ford and its products, and have acquired substantial good will that increases Ford's recognition and the attractiveness of its products to consumers.

3. Ford has attempted to protect its trademarks through federal trademark registration. It owns federal registrations for the FORD trademark for a variety of automotive products, including a 1929 registration for floor mats. Ford has also registered its BRONCO, CAPRI, COUGAR, COURIER, FIESTA, MERCURY, PINTO, RANGER, and THUNDERBIRD trademarks; these registrations have become incontestable and are conclusive evidence of Ford's exclusive rights to the marks. *See* 15 U.S.C. §§ 1065, 1115(b) (1982). Ford has also registered its Mustang and Thunderbird designs.

4. Plasticolor is a California corporation with its principal place of business in Fullerton, California. Since 1971 it has engaged in the business of manufacturing and selling plastic automobile accessories, including floor mats. It produces these items in a variety of designs and colors, some bearing designs or other graphics. Plasticolor sells its products through independent Ford dealers, automotive chains, catalog houses, mass merchandisers, van converters, repair shops and garages—many of the same outlets Ford uses for its own similar products or other parts. Plasticolor has promoted its products through brochures and industry trade shows, but has not engaged in substantial media advertising aimed at the consuming public.

5. In 1973, Plasticolor began selling small quantities of its accessories bearing Ford's PINTO trademark and Mustang design without license or any other authorization from Ford. Later, still without authorization, Plasticolor began selling mats and other accessories bearing other Ford marks: FORD, CAPRI, BRONCO, MERCURY, COUGAR, COURIER, FIESTA, ESCORT, RANGER and the Mustang and Thunderbird designs. In choosing to use the Ford trademarks, Plasticolor relied on the success of the genuine Ford products sold under those marks and the good will that Plasticolor would be able to exploit.

6. Most of Plasticolor's mats bearing Ford marks are packaged with cardboard header cards bearing the word "Plasticolor"; some bear as well the description "Ford Custom Carpet Front." The header cards do not indicate that "Plasticolor" is the manufacturer, and there is no indication of any relation to Ford or disclaimer thereof. Plasticolor has distributed a not insubstantial number of mats without any header cards; moreover, it has distributed some bearing Ford trademarks with the designation "O.E.," which is understood in the industry to mean "original equipment," even though the mats were not original equipment or authorized by Ford, the original equipment manufacturer.

On these facts, the prior opinion granted Ford's motion for summary judgment as to the claim for trademark infringement and unfair competition under the Lanham Act. The court found that Plasticolor's use of the Ford trademarks "creates a substantial likelihood of confusion among consumers and the general public as to the source or sponsorship of floor mats bearing the Ford trademarks." 698 F.Supp. at 202. The court was careful to limit its holding to Plasticolor's products as presented at the time. While Plasticolor represented that it intended to change its packaging, the court expressed no view as to a new design.

The prior opinion partially rejected and partially accepted Plasticolor's argument that its use of Ford's trademarks did not constitute infringement because the marks served a functional, rather than a source-

identifying, purpose. Plasticolor contended that it used the marks to provide a means by which car owners could decorate their cars and demonstrate their pride in owning a car manufactured by Ford, not to indicate that the floor mats were produced or authorized by Ford. The court found it "clear that Plasticolor's actual use of the Ford marks has served both a trademark [i.e., source-identifying] and a functional purpose.... To the extent that the use of the trademark creates confusion as to source, it is subject to the strictures of the Lanham Act." *Id.* at 203–04.

The prior opinion noted that Ford's three state law claims, under California's unfair competition statute, Cal.Bus. & Prof.Code §§ 17000–17500 (West 1987 & Supp.1989), California's dilution statute, Cal.Bus. & Prof.Code § 14330 (West 1987), and the common law of unfair competition, had not been sufficiently addressed by the parties. The court accordingly denied without prejudice Ford's motion as to the state law claims. 698 F.Supp. at 204.

**B. The Current Motions**

Subsequent to the filing of the prior opinion, Plasticolor has redesigned its packaging and has introduced samples of the new packaging into the record. All other facts remain unchanged. The court thus readopts the first five findings of fact from its prior opinion, and modifies the sixth to read as follows:

6. Most of Plasticolor's mats bearing Ford marks are packaged with cardboard header cards. The header cards identify the product as "floor mats," without specifying that the mats are designed to be used inside Ford cars. The cards do, however, include a photograph of a Ford car, with the Ford logo clearly visible. Beneath the header card, most of the floor mat is visible, including the portion which reads "FORD" (or "MUSTANG," or various other Ford trademarks) in large capital letters.

The lower third of the header card bears a two-section disclaimer. The upper section reads, in large letters: [6]

Manufactured By
PLASTICOLOR
Molded Products Inc.
Fullerton, California

The lower section reads, in smaller letters, "NOTICE," and on the line below, "This product is not authorized, sponsored, or manufactured by Ford Motor Co." [7] The underside of the floor mats bear similar disclaimers, in small letters, with insubstantial differences in wording, abbreviation and punctuation.

**II. The Lanham Act Claim**

The Ford trademarks on Plasticolor's floor mats serve two purposes. On one hand, a purchaser could reasonably interpret the marks as source-identifiers, as indicating that Ford has either manufactured or authorized production of the mats. On the other hand, a purchaser could reasonably consider the marks to be functional elements, designed to help the mats contribute to a harmonious ensemble of accessories and decorate the interior of a car. Indeed, a reasonable purchaser could easily interpret the marks both ways simultaneously.

If the marks were solely source-identifiers or solely functional elements, there would be an existing body of law to apply in ruling on the motions for summary judgment. Because the marks incorporate aspects of both, however, the court must first consider what law to apply.

**A. The Law**

In an ordinary case of trademark infringement, the plaintiff must prove that the alleged infringement creates a likelihood of confusion. 15 U.S.C. § 1114 (1982); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir.1984), *cert. denied*, 469

---

6. The disclaimer uses only capital letters; lower case letters are used here to indicate their relative size.

7. Ford has submitted a photograph of a Plasticolor "MUSTANG" floor mat in which the disclaimer is significantly smaller, and is worded slightly differently. We need not determine which design is actually being used by Plasticolor in order to reach a decision today.

U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985). " 'Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Alpha Indus., Inc. v. Alpha Steel Tubes & Shapes, Inc.,* 616 F.2d 440, 443 (9th Cir.1980), quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978).

A number of factors are relevant to this determination, including (1) the strength of the plaintiff's mark; (2) the extent to which the goods are related; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the degree of identity of marketing channels for the goods; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 790 (9th Cir.1981). In considering whether the buying public is likely to be confused, the factfinder cannot look merely at the point of sale; a mark that is likely to confuse prospective purchasers observing it after the point of sale constitutes no less an infringement. *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980).[8]

Functional features, on the other hand, are unprotected by trademark law. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). A feature is functional if it embodies the benefit

the consumer wishes to purchase, as opposed to an assurance that the product is manufactured or sponsored by a particular entity. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir.1987).[9] The purpose of the distinction was ably expressed by our own Judge Orr in one of the earliest cases to apply it in the context of the Lanham Act:

> If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952) (footnotes omitted).[10] A product feature is accordingly functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). *See also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987).[11]

---

8. While point-of-sale and post-sale confusion are both considered in determining whether there has been trademark infringement, the two are not equivalent in significance. Point-of-sale confusion is by far the more important, because it directly affects individuals who are in the market for the particular product. Post-sale confusion may affect future purchasers of the product, but in a more indirect and diffuse manner; post-sale confusion is far less likely to cause erroneous purchases than point-of-sale confusion.

9. The distinction substantially predates the Lanham Act. It was well-established by 1924, when the Supreme Court lent its approval to what was, at the time, vigorous competition in the chocolate-flavored liquid quinine market. *See William R. Warner & Co. v. Eli Lilly & Co.,* 265

U.S. 526, 531, 44 S.Ct. 615, 617, 68 L.Ed. 1161 (1924).

10. Judge Posner provides an economic justification for the nonprotection of functional features and generic names in *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338–40 (7th Cir.1985).

11. Recent authority has suggested the existence of two distinct types of functionality, "aesthetic functionality" and "utilitarian functionality." *See, e.g. First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1382 & n. 3 (9th Cir.1987). As the terms imply, a feature is aesthetically functional if it is desired for its appearance, but functional in a utilitarian sense if desired for its use. The distinction makes a difference only in cases involving an alleged infringement of a

Where a copied product feature is partially functional but partially source-identifying, we are presented with three alternatives. First, we could find that the source-identifying aspects of the feature trump the functional aspects, and simply apply the standard law of trademark infringement. Second, we could find the opposite, and hold that the feature is unprotected from copying. Third, we could attempt to find an appropriate middle ground. We consider each alternative in turn.

The first alternative has been adopted in a case very similar to this one. In *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651 (W.D.Wash.1982), the defendant, without authorization from the plaintiff, manufactured replicas of professional football jerseys. The court found that the jerseys' design, colors and use of team names created a likelihood of confusion as to sponsorship. *Id.* at 662. The court then discussed, without deciding, whether the jersey attributes were functional features, and concluded: "Even assuming the marks are functional[, this assumption] does not, however, preclude trademark protection. A functional feature may additionally serve as a trademark and be protected as such." *Id.* at 663.[12]

We are unable to adopt this reasoning. Affording the same degree of protection against mixed-use copying as against purely source-identifying copying has the effect of protecting functional features, a result clearly contrary to established trademark law. If we apply straightforward trademark law, we would enjoin the production of articles likely to cause public confusion as to source or sponsorship both at and after the point of sale. Confusion after the point of sale, however, is inherent in a partial functional use: A mixed-use article that eliminates the likelihood of confusion after the point of sale also defeats much of the feature's functionality. Consider some examples: A football jersey bearing the words "Seattle Seahawks (Not Affiliated with the Seattle Seahawks)"; a shoulder patch reading "Boston Bruins (Not Sponsored by the Boston Professional Hockey Association)"; a floor mat reading "Ford (Not Manufactured by Ford Motor Company)." These disclaimers would probably end confusion as to source, but would also effectively negate the functional aspects of the marks. Treating mixed uses exactly like source-identifying uses would thus protect functional features, a result contrary to established principles of trademark law. *See* p. 1336 *supra.* The reasoning of *National Football League* flies in the face of this authority.[13]

product's packaging or trade dress, where aesthetic functionality does not preclude protection but utilitarian functionality does. *See, e.g., Fabrica, Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 (9th Cir.1983). Where, as here, infringement is alleged of the actual product rather than the product's package, the law is identical whether the functionality of the product feature is utilitarian or aesthetic.

**12.** In another similar case, the Fifth Circuit effectively reached the same result, without being quite so explicit. *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), involved a defendant who manufactured embroidered cloth emblems depicting the trademarks of professional hockey teams. The court began its discussion of the case by noting that "[t]he difficulty with this case stems from the fact that a reproduction of the trademark itself is being sold, unattached to any other goods or services." *Id.* at 1010. Despite this effective concession of functionality, the court then went on to deter-

mine that the public would likely be confused as to sponsorship, *id.* at 1011–12, and to hold that the plaintiffs were entitled to an injunction, *id.* at 1012. The Fifth Circuit has subsequently explained that *Boston Hockey* is to be interpreted as holding that a trademark owner is protected from mixed-use copying, but not purely functional copying. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 389 (5th Cir.1977). The Ninth Circuit has rejected the reasoning of *Boston Hockey* insofar as it protects a pure functional use, but apparently not insofar as it protects a mixed use. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918–19 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

**13.** *National Football League* purports to find authority for its conclusion in *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). *National Football League*, 532 F.Supp. at 663. *Job's Daughters*, however, only suggested that *some*

An alternative approach would be to treat mixed uses as entirely functional uses, and accordingly withhold all protection. This alternative has been implicitly adopted in the Third and Sixth Circuits. *See Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir.1981); *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.*, 470 F.2d 975 (6th Cir.1972) (per curiam).[14] Again, we decline to follow, this time because to do so would contravene the clear language of the Lanham Act. Congress has provided that

> [a]ny person who shall, without the consent of the registrant ... use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1) (1982). *Any* use of a registered mark which causes confusion, whether additionally functional or not, is plainly covered by this language. Were we to treat mixed uses as purely functional, and thus withdraw all protection, we would be decimating a cause of action explicitly provided by Congress. We must accordingly reject the implicit holdings of *Keene* and *Schwinn*.[15]

In searching for an appropriate middle ground, we have little guidance beyond the fundamental principles discussed above;

research does not disclose any cases that have embarked on a similar journey. We do have, however, some assurance that the search is not misguided. The Ninth Circuit has twice posited the existence of the situation we confront today, and has twice suggested that there may be a middle ground between pure functionality and pure source-identification. *International Order of Job's Daughters*, after reaffirming that functional features are unprotected, cautioned:

> Our holding does not mean that a name or emblem could not serve simultaneously as a functional component of a product and a trademark. That is, even if the Job's Daughters' name and emblem, when inscribed on Lindeburg's jewelry, served primarily a functional purpose, it is possible that they could serve secondarily as trademarks if the typical customer not only purchased the jewelry for its intrinsic functional use and aesthetic appeal but also inferred from the insignia that the jewelry was produced, sponsored, or endorsed by Job's Daughters.... Accordingly, a court must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's product and the trademark owner.

633 F.2d at 919 (citations omitted). The following year, the court observed that "a trademark which identifies the source of goods and incidentally serves another function may still be entitled to protection."

---

protection may be available to mixed uses. It did not indicate that trademark holders were entitled to the same protection against mixed uses as against pure source-identifying uses. In light of the fact that the immediately preceding section of *Job's Daughters* devotes substantial space to a well-reasoned reaffirmation of the functionality doctrine, 633 F.2d at 917–19, it is hardly likely that the court would discard the doctrine when confronted by a mixed use.

**14.** Language in a recent opinion may misleadingly suggest that this alternative has also been implicitly adopted in the Ninth Circuit regarding the overall shape of a product: "For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional." *Clamp Mfg. Co. v. Enco Mfg. Co.*,

870 F.2d 512, 516 (9th Cir.1989). In context, however, the quoted passage merely rejects the possibility that an otherwise unprotectable (because functional) overall design could be protected by the mere addition of a few nonfunctional features. *Clamp* does not purport to resolve the question left open by *Vuitton* and *Job's Daughters*. See pp. 1338–39 *infra*.

**15.** *See W.T. Rogers Co. v. Keene*, 778 F.2d 334, 341 (7th Cir.1985) (involving a Keene different from the Third Circuit litigant) (denying all protection to feature only partially functional could have unintended effect of ruling out all trademark protection for source-identifying pleasing design features, because such features will inevitably be aesthetically functional to a certain extent).

*Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775 (9th Cir. 1981).

By indicating that mixed uses are entitled to some protection, *Job's Daughters* and *Vuitton* preclude the alternative of treating mixed uses as pure functional uses. But neither *Job's Daughters* nor *Vuitton* suggest that mixed uses are to be afforded full trademark protection. Satisfied that the answer lies somewhere in between, we begin our search for this middle ground.[16]

In finding a solution, we must reconcile two principles that often pull in opposite directions. The Lanham Act requires that we protect trademark registrants from confusion as to source or sponsorship, to the greatest extent consistent with the functionality doctrine. The functionality doctrine requires that we permit the copying of functional features to the greatest extent consistent with the Lanham Act. We must look, therefore, for a solution that permits trademarks to be copied as functional features, but minimizes the likelihood that the public will associate the copied mark with the registrant.

There need be no conflict between the two principles at the point of sale. The functional use of a trademark does not preclude a clear indication at the point of sale (in the form of a label, packaging, or other identification easily removed or concealed by the consumer) that the product is not manufactured or sponsored by the registrant. Floor mat purchasers can fully enjoy the functional use of a FORD floor mat even though the mat bears a removable notice disclaiming any affiliation with the Ford Motor Company. Applying a likelihood of confusion test at the point of sale will therefore not significantly deter the purchase of an article using a trademark as a functional feature.

It is only after the point of sale that the likelihood of confusion standard must be tempered. As discussed above, requiring the manufacturer to eliminate the likelihood of confusion past the point of sale will, in most cases, entirely eliminate the possibility that the mark could serve a functional purpose. A floor mat whose upper surface reads "FORD (not authorized by Ford Motor Company)" would obviously attract few customers. Protecting functional copying of trademarks will therefore require that we tolerate at least some confusion as to source or sponsorship after the point of sale.[17]

The potential for confusion can be diminished, however, by requiring that the manufacturer of a product that employs a trademark for functional purposes take all reasonable steps to eliminate post-sale confusion consistent with the functional use of the mark. The manufacturer will, for example, often be able to place a disclaimer on a portion of the article not generally visible while the article is in use. A notice of non-authorization on the underside of a floor mat, or a disclaimer affixed to the inside of a football jersey, will not hinder the functional use of a trademark, but may somewhat reduce the likelihood of post-sale confusion. In other cases, the copier may be able to place its own name alongside the copied trademark without interfering with the mark's functionality. There may also be cases where a visible disclaimer will not detract from the functional purpose of the trademark. Whatever the method chosen, it must be the most effective reasonably available that does not materially interfere with the trademark's functional purpose.

What constitutes reasonable measures will vary with the nature of the product and its market. In some cases, no reasonable measures may be available. A con-

---

16. Although recognizing that neither complete protection nor complete nonprotection is a satisfactory solution, *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir.1985), the Seventh Circuit has resigned itself to choosing one or the other, according to whether the functional or source-identifying aspects of the feature predominate. *Id.* at 346–48. With all respect, this court is more optimistic.

17. The possibility of post-sale confusion can be eliminated entirely if the registrant is able to embody its trademark in a copyrighted logo. *See, e.g., Camp Beverly Hills, Inc. v. Camp Central Park, Inc.*, 217 U.S.P.Q. (BNA) 783, 784 (S.D.N.Y.1982). Ford has not done so.

cealable disclaimer may be much easier to affix to a floor mat, for instance, than to jewelry. A particular measure is likely to be unreasonable if it substantially decreases consumer demand or materially increases production costs. Determining the most effective method reasonably available for eliminating the likelihood of confusion consistent with functional enjoyment of the mark is a question of fact, to be determined on a case by case basis.[18]

### B. The Summary Judgment Motions

■ We have determined that the mixed use of a trademark constitutes infringement where the likelihood of confusion exists as to source or sponsorship at the point of sale, or where the alleged infringer has not taken reasonable steps to eliminate the likelihood of confusion after the sale. We can now apply this standard to Plasticolor's use of Ford's trademarks.

Of the factors relevant to the determination of whether confusion at the point of sale is likely, all but one remain unchanged since the prior opinion. Ford's marks are still strong. *See Plasticolor Molded Prods. v. Ford Motor Co.*, 698 F.Supp. 199, 200 (C.D.Cal.1988). Plasticolor and Ford still sell nearly identical products, through many of the same channels. *See id.* at 201. It is still true that Plasticolor intentionally uses Ford trademarks to attract customers who own Ford automobiles. *See id.* The only change since the prior opinion is that Plasticolor has redesigned its packaging, requiring a reevaluation of the court's finding, based on the old packaging, of substantial evidence of actual confusion. *See id.* at 202.

The only evidence relevant to actual confusion are the mats themselves.[19] Without any evidence of the existence or nonexistence of actual confusion on the part of consumers, it is impossible to resolve this

factual issue. The mats and packaging, as discussed above, include trademarks belonging to both Ford and Plasticolor: Upon viewing the mats, it is impossible to determine as a matter of law whether the public is likely to be confused. While actual confusion is but one element of a multifactor inquiry, survey results are, in many cases, crucial in determining the likelihood of confusion. *See, e.g., Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir.1985) (en banc). This is such a case. The question cannot be resolved on summary judgment.

We are similarly unable to rule, as a matter of law, whether Plasticolor has taken adequate steps to avoid the likelihood of post-sale confusion. As discussed above, Plasticolor has affixed disclaimers to the underside of the mats, so that the disclaimers are not visible while the mats are in ordinary use. Anyone inspecting the mats' underside, however, would easily be able to see the disclaimer. Without any evidence as to whether the public is likely to remain confused despite the disclaimer, and without any evidence as to the mats' salability with a more prominent disclaimer, we are unable to ascertain whether the current disclaimer represents the most effective reasonable step to reduce post-sale confusion.

The motions for summary judgment as to the Lanham Act claim are accordingly denied.

### III. The State Law Claims

Ford claims that Plasticolor's use of the Ford trademarks constitutes unfair competition, a deceptive trade practice and a violation of California's anti-dilution statute. We consider the cross-motions for summary judgment as to each claim in turn.

### A. Unfair Competition

■ California unfair competition law, Cal.Bus. & Prof.Code §§ 17200–17208

---

**18.** This is not unlike the question of the likelihood of confusion, which is also a question of fact. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n. 5 (9th Cir.1985) (en banc).

**19.** Through discovery, Ford obtained preliminary surveys conducted by Plasticolor. Plasti-

color tells us that the surveys involved prototype packaging that differs in material respects from the packaging now in use. It is impossible to determine the effect of the current packaging by reference to surveys of consumer response to different packaging, and we therefore give these surveys little weight.

(West 1987 & Supp.1989), provides a cause of action substantially parallel to that provided by federal trademark law. *See International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 916 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). As with trademark law, a cause of action for unfair competition requires the likelihood of consumer confusion as to source or sponsorship. *Ball v. American Trial Lawyers Ass'n,* 14 Cal.App.3d 289, 304, 92 Cal.Rptr. 228, 238 (1971); *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 760 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). California unfair competition law, moreover, does not protect against the copying of functional features. *Tveter v. AB Turn–O–Matic,* 633 F.2d 831, 839 (9th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 300 (1981).[20]

Analysis of the unfair competition claim, therefore, tracks analysis of the Lanham Act claim. To prevail, Ford will have to prove (1) the likelihood of consumer confusion at the point of sale, and (2) that Plasticolor has not taken reasonable steps to eliminate the likelihood of confusion after the point of sale. Because each of these inquiries involves unresolved issues of fact, the cross motions for summary judgment are denied as to the unfair competition claim as well.[21]

### B. Deceptive Trade Practices

■ It is far from clear that California provides a cause of action for deceptive trade practices distinct from the cause of action for unfair competition. If the deception alleged by Ford consists of Plasticolor's advertising and marketing of its mats, Ford's cause of action is a branch of the tort of unfair competition which also requires Ford to show likelihood of confusion in order to prevail. *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793–94 (9th Cir.1981); Cal.Bus. & Prof.Code §§ 17200, 17500 (West 1987). Because deceptive advertising can cause consumer confusion only before or at the point of sale, we need not consider post-sale confusion: Ford can prevail on this claim by showing that Plasticolor's advertising is likely to cause confusion among potential purchasers as to the mats' source or sponsorship. Because the existence of the likelihood of confusion at the point of sale remains to be resolved, the motions for summary judgment are denied as to this claim as well.

### C. Dilution

Ford alleges that Plasticolor's use of Ford's marks dilutes the marks' distinctive quality, in violation of Cal.Bus. & Prof. Code § 14330 (West 1987). Ruling on the motions for summary judgment as to dilution will necessitate a four-part inquiry. First, we must determine whether Ford can state a claim under the statute. Second, we must address Plasticolor's contentions that the dilution statute is preempted by the Lanham Act and by the federal patent laws. Third, we must discern the effect of the 1985 amendment to section 14330, which added a new subsection (b) in response to *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). Fourth, we must apply the results of our analysis to the motions presented.

#### 1. *A Dilution Cause of Action*

■ Section 14330(a) provides:

---

**20.** Indeed, to the extent that the thing being copied is a functional physical feature of an article or the article itself, state unfair competition law would be preempted by federal patent law. *See Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). The question of whether patent law preempts state protection against functional copying of a *word* will be considered below. *See* section III(C)(2)(b) *infra.*

**21.** Ford's counterclaim purports to allege a separate count based on the common law of unfair competition. Research has disclosed no authority for the proposition that California has a common law of unfair competition distinct from the caselaw interpreting the unfair competition statute. The existence of parallel bodies of law governing the same conduct would appear to be of little practical value; any point of divergence between the two would be controlled by the statute.

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Cal.Bus. & Prof.Code § 14330(a) (West 1987). While the statute speaks in terms of protecting against two distinct harms—injury to business reputation and dilution of a mark's distinctive quality—the first harm has consistently been deemed subsumed in the second. Courts have interpreted the statute to include injury to business reputation as one of the possible elements supporting a cause of action for dilution. *See, e.g., Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir.1981) (rejecting claim of dilution where "Sears' use of the reptilian monster character on its garbage bag packages [does not] link Godzilla with something unsavory or degrading").

What differentiates dilution from trademark infringement and unfair competition is that it dispenses with the need to show likelihood of confusion. The dilution statute protects against an injury less immediate than the loss of sales due to purchaser confusion; it protects against what is frequently termed "the gradual diminution or whittling away of the value of a trademark, resulting from use by another." 2 J.T. McCarthy, *Trademarks and Unfair Competition* § 24.13, at 213 (2d ed. 1984). Similar metaphors abound: Courts speak in terms of "blurring," *McFly Inc. v. Universal City Studios, Inc.*, 228 U.S.P.Q. (BNA) 153, 161 (C.D.Cal.1985), "tarnishing," *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 228 U.S.P.Q. (BNA) 859, 863 (C.D.Cal.1985) (quoting *Toho*, 645 F.2d at 793), *aff'd*, 809 F.2d 601 (9th Cir.1987), and even "infection," *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 859 (C.D.Cal.1985) (quoting *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y.1972)). Dilution thus refers to copying which, while not sufficiently confusing to divert sales in the short run, will tend to divert them in the long run by weakening the instantaneous favorable associations the public makes with highly regarded products. *See Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549–50 (7th Cir.1982).

Courts were suspicious of California's dilution statute in the years immediately following its 1967 enactment. Despite the broad wording of the statute, it was not unusual for courts to express reluctance about giving the section an "overly broad application lest it swallow up all competition in the claim of protection against trade name infringement." *Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler*, 305 F.Supp. 1210, 1217 n. 13 (N.D.Cal.1969). *See also Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 803 (9th Cir. 1970). The concern was a legitimate one; if dilution were treated simply as unfair competition minus the need to show likelihood of confusion, the doctrine would effectively render unfair competition and trademark law superfluous for redressing claims of trade name copying.

Dilution doctrine has accordingly been limited by the principle that only the most distinctive marks are eligible for protection. 2 J.T. McCarthy § 24.14. *See, e.g., Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir.1989) (ACCURIDE insufficiently distinctive to merit protection under section 14330); *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1175 (C.D.Cal. 1986) (GODIVA mark for chocolate strong enough to be entitled to protection against dilution), *aff'd mem.*, 830 F.2d 197 (9th Cir.1987); *Builders Square, Inc. v. Wickes Cos.*, 227 U.S.P.Q. (BNA) 644, 649, 1985 WL 5469 (C.D.Cal.1985) (BUILDERS EMPORIUM not distinctive enough to be protected by dilution statute). So limited, dilution coexists peaceably with unfair competition as an adjunct doctrine providing a greater measure of protection for the most distinctive trade names.

This limitation poses no obstacle for Ford. The name FORD and Ford's other marks used by Plasticolor on its floor mats (CAPRI, BRONCO, MERCURY, COUGAR, COURIER, FIESTA, ESCORT, RANGER,

and the Mustang and Thunderbird designs) are sufficiently distinctive to warrant protection under the anti-dilution statute. The marks are arbitrary and fanciful, have been extensively used for many decades, have been heavily advertised and are well known to the public. Each of Ford's marks is strong enough to be eligible for protection under section 14330. *Cf. Grey*, 650 F.Supp. at 1175.

■ Neither is Ford hindered by two other asserted obstacles. The fact that Ford and Plasticolor are competitors in the same market does not preclude protection; a cause of action for dilution can exist where the plaintiff and defendant provide the same product or service. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir.1988) (name of one real estate brokerage firm can dilute mark of another). *See also Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1489 (10th Cir.1987) (interpreting New Mexico dilution statute). *But see EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375, 380 (7th Cir.1984) (reaching opposite result applying Illinois statute); *Smithkline Beckman Corp. v. Procter & Gamble Co.*, 591 F.Supp. 1229, 1246–47 (N.D.N.Y.1984) (reaching opposite result applying New York statute), *aff'd mem.*, 755 F.2d 914 (2d Cir.1985).

■ Nor does the fact that Plasticolor's use of Ford's marks is partially functional preclude protection. The statute itself makes no distinction between source-identifying and functional uses; indeed, the fact that the likelihood of confusion as to source is explicitly not an element of the cause of action is a strong indication that the statute is intended to protect against functional uses of trademarks. Functional copying, moreover, can often constitute the very sort of injury the statute is designed to prevent. *See, e.g., Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1191 (E.D.N.Y.1972) (reproduction on poster of COCA–COLA mark, along with distinctive script and format, where mark is altered to read "Enjoy Cocaine," dilutes mark) (applying New York statute); *Bi-Rite Enters., Inc. v. Button Master*, 555 F.Supp. 1188, 1196 (S.D.N.Y.1983) (applying New York dilution statute to sale of buttons bearing names of musical groups, but finding that the plaintiffs had made no showing of harm). The purely functional copying of a trademark, such as the sale of shirts bearing the FORD name and logo, could dilute the mark's distinctive quality as surely as the sale of Ford beer or Ford aftershave. Section 14330 thus affords protection.

A more difficult question concerns what the statute protects *against*. Courts have interpreted the statute to protect the holder of a distinctive mark against four overlapping types of injury. We consider each in turn.

First, the statute protects the mark against association with something unsavory or degrading. *See, e.g., Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir.1981) (finding no dilution in part because use of GODZILLA in connection with garbage bag packages is not unsavory or degrading); *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1175 (C.D.Cal.1986) (DOGIVA name for dog biscuits causes dilution of GODIVA mark for chocolate, in part because of injury to business reputation caused by associating food for animals with food for human consumption), *aff'd mem.*, 830 F.2d 197 (9th Cir.1987); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 & n. 8 (2d Cir.1979) (use of distinctive cheerleading uniform in "sexually depraved film" is ground for injunction under New York dilution statute).

Second, the statute protects against the tarnishing of a mark, and resulting injury to business reputation, caused by association with a poorly manufactured product. *See, e.g., McFly, Inc. v. Universal City Studios, Inc.*, 228 U.S.P.Q. (BNA) 153, 161 (C.D.Cal.1985) (use of surname McFly in popular film "Back to the Future" not dilutive of mark used by group of restaurants and bars, in part because of relevance of "the high quality of a junior user's goods and services"); *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983) (affirming finding of no dilution under New

York statute in part because alleged diluter's products were of higher quality).

Third, the statute protects against genericide,[22] the tendency of a widely-used product name to become the generic term for the product. *See, e.g., Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 856–59 (C.D.Cal.1985). *See also R.G. Smith v. Chanel, Inc.,* 402 F.2d 562, 569 (9th Cir. 1968) (applying common law of unfair competition where district court decision predated enactment of dilution statute).

Fourth, the statute protects against the gradual impairment of a trademark when it is used to identify unaffiliated products, a practice that tends to diffuse the public's immediate association of the mark with the source. *See, e.g., Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793 (9th Cir. 1981); *Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 965 (6th Cir.1987) (applying Ohio common law); *Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 549–50 (7th Cir.1982) (applying Illinois statute).

Section 14330 speaks of the *likelihood* of dilution, not actual dilution. Cal.Bus. & Prof.Code § 14330(a); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir.1988). Thus, unless the statute is preempted by federal law, and unless the 1985 amendment materially alters the statute's coverage, Ford can prevail on its dilution claim if it proves that Plasticolor's use of its marks causes the likelihood of any of these four types of injury.

## 2. *Preemption*

Plasticolor contends that because the dilution statute dispenses with the requirement of proving a likelihood of confusion, it is preempted by the Lanham Act or, to the extent that the dilution statute purports to prohibit the copying of functional features, the federal patent law. Both of these contentions misapprehend the nature of federal preemption.

Any discussion of preemption must start with *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), where the Supreme Court held that state unfair competition law cannot prohibit the copying of an unpatentable article. To let a state do so, the Court observed, "would be to permit the State to block off from the public something which federal law has said belongs to the public." *Sears,* 376 U.S. at 232, 84 S.Ct. at 789. The Court found that in enacting the patent laws, Congress had balanced the twin needs of spurring invention and promoting free competition. *Id.* at 230–31, 84 S.Ct. at 788. State protection of articles Congress has declared unprotectable would upset the balance; just as a state law extending the life of a patent beyond the expiration date set by Congress would clash with the objectives of the patent law, so would a more indirect extension of protection as was available under state unfair competition law. *Id.* at 231, 84 S.Ct. at 788.

Subsequent cases have made it clear, however, that the supremacy clause does not require full congruence between federal and state intellectual property protections. *See Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (federal copyright law does not preempt state copyright law providing greater protection); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (federal patent law does not preempt state trade secret law protecting unpatentable processes); *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979) (federal patent law does not preempt state contract law enforcing royalty agreement as to unpatentable invention). State regulation is preempted only where the Constitution expressly provides that federal regulatory power is exclusive, where the Constitution expressly prohibits the states from

---

**22.** The term genericide, although by now firmly esconced in the literature, is a malapropism: It refers to the death of the trademark, not to the death of the generic name for the product. A more accurate term might be trademarkicide, or perhaps even generization, either of which seems to better capture the idea that the trademark dies by becoming a generic name.

regulating, or where state regulation would conflict with federal. *Goldstein,* 412 U.S. at 552–53, 93 S.Ct. at 2307–08 (quoting *The Federalist* No. 32, at 241 (A. Hamilton) (B. Wright ed. 1961)). As neither of the first two conditions is satisfied regarding intellectual property protection, *see Kewanee,* 416 U.S. at 480, 94 S.Ct. at 1885; *Goldstein,* 412 U.S. at 553, 93 S.Ct. at 2308, determination of whether state protection is preempted "involves a consideration of whether [state] law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Kewanee,* 416 U.S. at 479, 94 S.Ct. at 1885 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). *See also Aronson,* 440 U.S. at 262, 99 S.Ct. at 1099.

It is accordingly necessary to examine the objectives underlying federal trademark and patent protection, to determine whether federal law preempts California's dilution statute as applied to the partially functional copying of a trademark.

### a. The Lanham Act

The Lanham Act does not, by its terms, foreclose broader protection afforded under state law. Indeed, the Act explicitly contemplates the continued existence of state law protection. *See* 15 U.S.C. § 1065 (1982) (under certain conditions right to use mark becomes incontestable "except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State"). We can thus infer that the goal of nationwide uniformity, while undoubtedly one of the objectives of the Lanham Act, *see* S.Rep. No. 1333, 79th Cong.,

2d Sess., *reprinted in* 1946 U.S.Code Cong. Serv. 1274, 1276–77, was not paramount. Instead, the Act serves the goal of national uniformity by providing a nationwide floor, assuring the public and trademark owners at least a minimum level of protection. *See id.* at 1277 ("a sound public policy requires that trade-marks should receive nationally the greatest protection that can be given them").[23]

Nor does the existence of state law protection interfere with the two major purposes of the Lanham Act:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

*Id.* at 1274. *See also Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372 n. 3 (1st Cir.1980); *Mariniello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.1975). State law providing greater protection clearly does not conflict with either of these objectives. *See Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980).

Moreover, unlike the strict specifications of the patent laws (the requirements of novelty, utility and nonobviousness and the 17–year time limit), which embody a congressional balancing of the benefits of free competition with those of promoting invention, the requirements of the Lanham Act embody no such balancing. While there is a public interest in promoting competition

**23.** We thus reject the reasoning of *United States Jaycees v. Commodities Magazine, Inc.,* 661 F.Supp. 1360, 1365–68 (N.D.Iowa 1987), which held that the Lanham Act preempts Iowa's dilution statute. *United States Jaycees* relies entirely on the Lanham Act's objective of nationwide uniformity; the opinion ignores the fact that the Act itself permits inconsistent state protection, and disregards the language in the Senate report indicating that uniformity was desirable because local law was providing too little protection, not too much. *See id.* at 1367. The logic of *United States Jaycees* would require the invalidation of all state unfair competition protection

more extensive than that provided by the Lanham Act, a result we are clearly foreclosed from reaching. *See Golden Door, Inc. v. Odisho,* 646 F.2d 347, 351–52 (9th Cir.1980); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 916 (9th Cir.1980) (state unfair competition "protections need not track those provided by the Lanham Act"), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). *United States Jaycees* appears to be the only decision ever to hold that a dilution statute is preempted by the Lanham Act. 2 J.T. McCarthy, *Trademarks and Unfair Competition* § 24.13, at 66 (Supp.1988).

in the production of goods and services, there is no analogous public interest in competition to sell a good or service under a particular trade name. The two interests at war in the patent arena are aligned when it comes to trademarks; the public interest in product competition is served by granting monopolies in trade names the public has come to recognize, because such monopolies ensure that the public is receiving accurate information as to the sources of competing goods.

This lack of patent-like balancing in the Lanham Act manifests itself in the absence of patent-like requirements. Trademarks need not represent any advance in the state of the art of trade names to be eligible for protection; there is no requirement that a trademark be clever or creative. Even the most mundane mark, if recognized by consumers, is entitled to protection. The Lanham Act places no limit on the duration of the monopoly; a mark that is widely associated with its owner is protected in perpetuity. State trademark protection cannot upset any sort of delicate balance in the Act, as it can regarding the patent law, because the Act incorporates no such balance.

■ The Lanham Act thus does not preempt state trademark protection greater than that provided by the Act. "By extending to federal registrants greater protection than is available under the Lanham Act, California law, like the Act, protects both the public from confusion about the services and products it is receiving and the public relations investment of plaintiff." *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980). State law is preempted only where it provides *less* protection than the Lanham Act, where it permits federal trademarks to be infringed. *Id.* (quoting *Mariniello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.1975)). Otherwise, the states are free to provide forms of protection not included in the Lanham Act. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 916 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

The Lanham Act thus does not preempt California's dilution statute. We now turn to the question of whether the statute, as applied to the functional copying of trademarks, is preempted by the patent laws.

### b. The Patent Laws

There is no doubt that the patent laws preempt state laws that provide greater protection against the copying of articles. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). As the Court subsequently explained, *Sears* and *Compco* involved "the question [of] whether a State could, under principles of a state unfair competition law, preclude the copying of *mechanical configurations* which did not possess the qualities required for the granting of a federal design or mechanical patent." *Goldstein v. California,* 412 U.S. 546, 569, 93 S.Ct. 2303, 2316, 37 L.Ed.2d 163 (1973) (emphasis added). Plasticolor would have us extend the holdings of *Sears* and *Compco* beyond mechanical configurations, to require the preemption of state protection of any functional aspect of a product, including a word such as Ford. Such an extension, however, has been foreclosed by *Goldstein* and by *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

In both of these cases, the Court drew a distinction between items that are within the sphere of the patent laws, but are unprotected, and items that fall outside of that sphere. *Goldstein* rebuffed a claim that the patent laws preempted state protection against record piracy, observing:

In regard to mechanical configurations, Congress had balanced the need to encourage innovation and originality of invention against the need to insure competition in the sale of identical or substantially identical products. The standards established for granting federal patent protection to machines thus indicated not only which articles in this particular category Congress wished to protect, but which configurations it wished to remain free. The application of state law in these cases to prevent the copying

of articles which did not meet the requirements for federal protection disturbed the careful balance which Congress had drawn and thereby necessarily gave way under the Supremacy Clause of the Constitution. No comparable conflict between state law and federal law arises in the case of recordings of musical performances. In regard to this category of "Writings," Congress has drawn no balance; rather, it has left the area unattended, and no reason exists why the State should not be free to act.

*Goldstein,* 412 U.S. at 569–70, 93 S.Ct. at 2316.

While *Goldstein* involved the question of whether state protection was preempted by federal *copyright* law, it established a distinction which *Kewanee* carried over into patent law. *Kewanee* was concerned with whether patent law preempts state trade secret law to the extent that state law protects unpatented items. The Court first divided unpatented items into two categories, the first of which was "items which would not be proper subjects for consideration for patent protection under 35 U.S.C. § 101." [24] *Kewanee,* 416 U.S. at 482, 94 S.Ct. at 1886. Augmented state protection for these items, the Court held, would not be preempted by the patent law: "As in the case of the recordings in *Goldstein v. California,* Congress, with respect to nonpatentable subject matter, 'has drawn no balance; rather it has left the area unattended, and no reason exists why the State should not be free to act.'" *Id.* at 482–83, 94 S.Ct. at 1886–87 (quoting *Goldstein,* 412 U.S. at 570, 93 S.Ct. at 2316).

■ The distinction could not be more plain. States cannot, consistent with the patent law, prohibit the copying of product features that fall within the general subject matter of the patent laws. But states *can* prohibit the copying of features that are ineligible for patent protection by virtue of the fact that they fall entirely outside the scope of the patent laws. As to these features, state protection does not conflict with any objective of federal patent law.[25]

■ A trademark clearly falls into this second category. A trademark is not a process, machine, manufacture or composition of matter; it therefore does not fall within the broad category of items statutorily eligible for patent protection. A trademark or service mark is a word or a group of words identifying the source of goods or services. Even when used functionally, trademarks are items to which the patent laws do not speak. Enhanced state protection is not precluded.

As section 14330(a) is not preempted by federal trademark or patent law, it is applicable to Plasticolor's use of Ford's marks. We next consider the effect, if any, of the 1985 amendment to the statute.

### 3. *The 1985 Amendment*

■ In 1985 the California legislature amended section 14330 by adding subsection (b), which reads:

Any person who uses or unlawfully infringes upon a mark registered under this chapter or under Title 15 of the United States Code, *other than in an otherwise noninfringing manner,* either on the person's own goods or services or to describe the person's own goods or services, irrespective of whether the mark is used primarily as an ornament, decoration, garnishment, or embellishment on or in products, merchandise, or goods, for the purpose of enhancing the commercial value of, or selling or soliciting purchases of, products, merchandise, goods or services, without prior consent of the owner of the mark, shall be sub-

**24.** 35 U.S.C. § 101 (1982) provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The category referred to by the Court thus includes everything that is not a process, machine, manufacture or composition of matter. A trademark is none of these.

**25.** The Court has recently restated the distinction in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* —— U.S. ——, 109 S.Ct. 971, 980–81, 103 L.Ed.2d 118 (1989).

ject to an injunction against that use by the owner of the mark.

Cal.Bus. & Prof.Code § 14330(b) (West 1987) (emphasis added; footnote omitted). This amendment was proposed by legislators concerned about cases in the federal courts, particularly *Job's Daughters* in the Ninth Circuit, which allowed the functional use of trademarks by competitors. These legislators intended to provide a dilution cause of action where, because a mark is used functionally, federal trademark law affords no redress. Whether they accomplished this purpose is, as we shall see, another question entirely.

Subsection 14330(b), as enacted, is not easy to comprehend. The subsection begins by authorizing an injunction against anyone who "uses or unlawfully infringes upon" a registered trademark; this phrase appears to prohibit *all* uses of trademarks, whether or not they constitute an infringement under federal law. The second clause, however, takes away everything the first has given, by exempting anyone who uses a trademark "in an otherwise noninfringing manner." What we are left with is a prohibition against those ornamental uses that constitute infringements under federal law. So construed, the 1985 amendment leaves the law exactly as it found it.

Puzzled by this result, we turn to the legislative history, which is instructive. As originally drafted, the statute did not contain the phrase underscored above. Absent that phrase, the statute would be quite clear: It would prohibit *all* ornamental uses of registered trademarks, regardless of whether they constituted an infringement under federal law. The legislative record discloses that the original version of the statute ran into opposition from the state bar, which argued that the statute would sweep too broadly, prohibiting some innocuous uses of trademarks.[26] But the language adopted to amend the amendment was not, as discussed above, narrowly tailored: It excludes not merely some noninfringing uses, but all of them.

When drafting a statute, the legislature must embody its intentions in precise statutory language; the parties and the court must not be left to guess what the legislature meant. Where, as here, a statute incorporates competing concerns, the legislature must resolve those concerns in a meaningful way and select statutory language that clearly reflects the nature of that resolution. This it failed to do here. As best we can tell, one faction supported the statute as originally written, another thought it too broad. In attempting to satisfy both sides, the legislature added language that nullified the language already there. By trying to say everything, the legislature succeeded in saying nothing at all.

It is not the function of the courts to draw distinctions that the legislature failed to draw. Separating what is prohibited from what is permitted requires an exercise of policy judgment, a weighing of conflicting considerations. That is the responsibility of the political branches under our tripartite system of government. Having found no such line drawn by subsection 14330(b), we conclude that it neither adds to nor subtracts from the law as it stood prior to its enactment. We disregard it.

### 4. *The Summary Judgment Motions*

■ Ford has never suggested that there is anything unsavory or degrading about floor mats. *See Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793 (9th Cir.1981). Indeed, the fact that Ford itself is in the floor mat business would render any such claim frivolous. Neither has Ford suggested that Plasticolor's floor mats are poorly manufactured, *see McFly, Inc. v. Universal Studios, Inc.,* 228 U.S.P. Q. (BNA) 153, 161 (C.D.Cal.1985), or that any of Ford's marks are in danger of becoming the generic term for floor mats, *see Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 856–59 (C.D.Cal.1985). Ford can thus prevail on its dilution claim only by proving that Plasticolor's use of its marks is likely to diminish the marks' ef-

---

**26.** The underscored language was apparently intended to exempt companies which used identical trade names but produced widely different products.

fectiveness by attenuating the public's association of the marks with Ford. *See Toho*, 645 F.2d at 793.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Ford bears the burden of establishing dilution. After nearly four years of litigation and two rounds of summary judgment motions, Ford has failed to introduce the least bit of evidence supporting its claim that Plasticolor's use of its marks dilutes their distinctive quality. The only evidence on this point is the floor mats themselves, and their appearance raises precisely the opposite inference. The mats contain clear, legible and accurate depictions of various Ford trademarks and logos. They are sold to the public for use in conjunction with Ford products, giving consumers the opportunity to express their allegiance to their Ford-manufactured automobiles. If anything, such use is likely to *increase* the distinctiveness of Ford's marks. As Judge Sofaer noted in rejecting a similar claim that the sale of buttons bearing the trademarked names of musical groups diluted the marks' distinctive quality, "defendants' use only operates to strengthen plaintiffs' marks. Rather than clouding the distinctive message of quality that plaintiffs' marks carry, defendants provide fans of the various Performers an opportunity to announce their allegiance to the groups, thereby publicizing the popularity of the groups." *Bi–Rite Enters., Inc. v. Button Master*, 555 F.Supp. 1188, 1196 (S.D.N.Y.1983).

Ford has had ample opportunity to introduce evidence of the likelihood of dilution and has utterly failed to do so. Plasticolor's summary judgment motion as to Ford's counterclaim for dilution is accordingly granted.

## IV. Damages for Past Infringement

■ The last opinion, dated May 9, 1988, determined that Plasticolor's sale of floor mats bearing Ford trademarks, as the mats were packaged at the time, constituted trademark infringement. 698 F.Supp. at 204. Ford claims it is entitled to damages and an accounting of wrongful profits flowing from this infringement.

Section 35 of the Lanham Act, 15 U.S.C. § 1117(a) (Supp. IV 1986), provides, in relevant part:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117(a) (Supp. IV 1986). Because Plasticolor's use of the Ford marks was intentional, 698 F.Supp. at 201, Ford can recover damages under this section. *Faberge, Inc. v. Saxony Prods., Inc.*, 605 F.2d 426, 429 (9th Cir.1979) (per curiam); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir.), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968).

If this were a case of pure trademark infringement, Ford would be entitled to an accounting of Plasticolor's profits from sales of the infringing floor mats. *See, e.g., Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274–75 (9th Cir.1982). But because the Lanham Act does not prohibit functional copying, Ford cannot recover profits from sales to consumers who were not confused as to the source of the floor mats. These consumers were interpreting the Ford marks in their functional, hence unprotected, capacity; Ford is not entitled to any recovery flowing from these sales.

Ford can recover, however, to the extent that Plasticolor's uses of the Ford marks

were interpreted by purchasers as identifications of source. These sales, where the marks produced consumer confusion, represent classic examples of trademark infringement. Ford is thus entitled to an accounting of Plasticolor's profits flowing from these sales only.

Sorting out one type of sale from another should not be too difficult. The parties have submitted surveys indicating levels of purchaser confusion: We need simply determine an appropriate overall percentage of confusion and apply it to Plasticolor's total profits in order to arrive at a figure representing profits attributable to confusion.[27] Section 1117(a) sets out the procedure to follow. Ford has the burden of proving only the total amount earned by Plasticolor on sales of Ford-trademarked floor mats through May 9, 1988. Plasticolor then must prove (1) the percentage of that figure to be counted as profit, (2) the percentage of profit not attributable to consumer confusion, and (3) any other deductions it claims to be appropriate. 15 U.S.C. § 1117(a) (Supp. IV 1986).

### V. Attorneys' Fees

■ Section 1117(a) authorizes the award of attorneys' fees "in exceptional cases." 15 U.S.C. § 1117(a) (Supp. IV 1986). Such an award is appropriate where "the defendant's acts 'constituted extraordinary, malicious, wanton, and oppressive conduct.'" *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1043–44 (9th Cir.1986) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1026 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986)). There is nothing exceptional about this case; Plasticolor's conduct has not been particularly egregious. *Cf. Transgo*, 768 F.2d at 1026 (affirming award of attorneys' fees where defendants had conspired to pass off goods as plaintiffs'); *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1276 (9th Cir.1982) (reversing denial of attorneys' fee award where defendants had deliberately deceived the public); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 526–27 (D.C.Cir.1985) (awarding attorneys' fees where plaintiff engaged in abusive litigation tactics). The legal issues presented were novel and their resolution not easily predictable. While Plasticolor's use of Ford's marks was deliberate, there is no evidence suggesting that Plasticolor intended to deceive the public. Ford is thus not entitled to recover attorneys' fees under section 1117(a).

### VI. Conclusion

Plasticolor's motion for summary judgment is granted as to Ford's counterclaim for dilution. All other motions for summary judgment are denied. Ford is entitled to recover damages and costs proportionate to the percentage of Plasticolor's sales before May 9, 1988, attributable to consumer confusion as to the source of the floor mats. Ford is not entitled to recover attorneys' fees.

---

**27.** This percentage can also be applied to Ford's total cost of suit in order to determine the level of costs to be awarded under section 1117(a).